CORRINE HOLLAND MURPHY v. ANTON LOEFFLER AND ANTON LOEFFLER, JR., Appellants.—39 S. W. (2d) 550.

Division Two, June 5, 1931.

*Wilbur C. Schwartz* and *J. Edward Gragg* for appellants.

*Walter L. Brady* for respondent.

FITZSIMMONS, C.—Plaintiff sued Anton Loeffler and his son, Anton Loeffler, Jr., for $10,000 damages for the death of her husband, George Holland, in the first count, and for $25,000 damages for personal injuries to herself, in the second count. The damages sued for arose out of a collision of an automobile owned by Anton Loeffler and driven by Anton Loeffler, Jr., with plaintiff and her husband, George Holland, while she and he were on foot in the roadway at the intersection of Gravois Avenue and Itaska Street in the city of St. Louis, on November 7, 1926. A trial was had and there was a verdict against both defendants on the first count for $5,000, and on the second count for $7,500. Motions for a new trial were overruled, and defendants took and perfected their appeals from the judgment upon the two counts for $12,500. After the death of her husband, George Holland, and after suit had been filed, plaintiff married a man named Murphy. For convenience

the defendants Loeffler sometimes may be referred to as father and son.

Plaintiff and her husband, George Holland, spent the evening of Saturday, November 6, 1926, visiting friends on Varrelmann Avenue in St. Louis, and they left for their home about one-thirty o'clock in the morning of November 7th. They walked a short distance to the southwest corner of Gravois Avenue and Itaska Street, to catch an eastbound Cherokee street car, and they stood waiting for twenty minutes upon the sidewalk. Then they saw a car approaching from the west, and plaintiff testified they walked into the roadway of the street and stood at a point where cars usually stopped for passengers and about four feet from the track upon which the car was running. The south rail was about twenty and one-half feet from the south curb, and plaintiff and her husband were about sixteen feet from the south curb. Plaintiff held on to her husband's arm, as she stood with him, and saw the headlight of the street car a block and a half distant. She also saw the headlight of an automobile, which, when first seen, was about one block away. But it approached fast as she and her husband held tightly to each other. Plaintiff exclaimed: "Oh, look at those lights!" She and her husband were struck by the automobile, and she recovered consciousness in the City Hospital some hours later. She was removed to the Missouri Pacific Hospital, and was a patient there from November 8, 1926, to February 16, 1927. She never saw her husband again, for he died a few hours after he was injured.

Plaintiff testified that she and her husband did not move from the time that they walked to the safety zone in the street until they were struck. Defendant Loeffler, Jr., driver of the auomobile, testified that he did not see plaintiff and her husband until he was twenty feet from them. They seemed to be jerking each other. One was pulling forward and the other was drawing back. He applied his brakes and swerved to the left, but they kept up the pulling and hauling, and he struck plaintiff and her husband with the left front fender and headlight. On direct examination he testified that they were stepping into the street when he first saw them, but on cross-examination he said that they were between the south rail of the car track and the south curb of Gravois Avenue.

There was a street gas lamp at the southeast corner and also at the northwest corner of Gravois Avenue and Itaska Street. Plaintiff's testimony that a filling station at the northwest corner was illuminated at the time of the accident was not successfully disputed. It was a crisply cold, clear, moonlight night according to plaintiff, and this statement was not seriously questioned. Henry Costa, a taxicab driver, testifying for defendants, did not consider the intersection of Gravois Avenue and Itaska Street well lighted, but a

few minutes before the accident, while he was driving west on the north side of Gravois Avenue, he distinctly saw the plaintiff and her husband standing on the sidewalk on the south side of Gravois, the width of the street from him. Defendant Loeffler, Jr., testified that, on the night of the accident, the headlights of the automobile would reveal a human form fifty or sixty feet away.

Plaintiff could not estimate the speed of the automobile. "It came so quickly, all I could see was lights," she testified. She kept watching the approaching lights. She could not move or run and she and her husband drew more closely together. Andrew J. Grega, a policeman off duty, was walking along Itaska Street, and was within one-half block of Gravois Avenue. He saw plaintiff and her husband standing in position to board the street car. He saw defendant Loeffler, Jr., driving his touring car "at a high rate of speed," on a straight line, and saw the automobile strike Mr. and Mrs. Holland. Loeffler, Jr., "beat it for about two hundred yards," according to Grega, but it was obvious that the policeman was not sure whether it was feet or yards. Loeffler himself testified that he stopped within eight feet of the prostrate bodies and then pulled over to the southeast corner. Grega also testified that when Loeffler, Jr., stopped and the policeman approached him, the young man said: "I didn't see them." Loeffler, Jr., did not recall that he made this statement. He would not say that he did not make it, and he might have said it. He testified that he was driving the automobile when about a block away from Itaska Street, at about twenty-five to twenty-eight miles per hour, but he slowed down to twenty-three to twenty-five miles as he approached Itaska Street. He testified that he could stop the automobile when going twenty-five miles an hour within twenty-four feet. There was agreement of witnesses that the street was paved and was dry.

It was admitted that plaintiff's husband, George Holland, died from the injuries which he received when he was struck by the automobile. The personal injuries received by plaintiff were not disputed. She suffered a linear fracture of the skull which produced paralysis of the left side of the face. A small chip of bone was knocked off the left knee cap and her right wrist was fractured. This last injury made necessary an incision to put the bones in place. Scars on the forehead and right wrist were pronounced permanent. Plaintiff at the time of the accident was earning $100 per month in her employment as a stenographer for the Missouri Pacific Railroad.

Plaintiff's amended petition pleaded as negligence, in both counts, excessive and dangerous rate of speed of the automobile and failure of the driver to maintain a watch and to warn. Plaintiff also pleaded the last-chance doctrine, upon which assignment of negligence alone the case went to the jury.

Defendant Loeffler, Sr., by his separate answer, admitted that he owned the automobile in question and that his son was driving it at the time of the accident at Gravois Avenue and Itaska Street. The elder Loeffler also pleaded that he kept the automobile for use in his business and for pleasure, and he denied that at the time and place mentioned the son was in the employ of the father or was engaged in the father's business or was using or operating the automobile at the request or under the direction of the father. He also pleaded that at the time and place of the accident his son was engaged in his own private business and was not the agent of nor acting under the direction nor at the request of the senior defendant. He made a general denial of all other allegations. The testimony on the issue whether the son was the agent or servant of the father at the time of the accident will be examined in the opinion on this point.

The separate answer of defendant Loeffler, Jr., was a general denial of both counts and a plea of contributory negligence of plaintiff and of her husband. The specifications of the plea were that although Mr. and Mrs. Holland were standing in a place of safety near the eastbound street car track at the intersection of Gravois Avenue and Itaska Street, and although they saw or could have seen the automobile turn into the street car track for the purpose of passing them, yet that they left their place of safety and walked directly into the path of the automobile driven by defendant, and thereby suffered death in one instance and injury in the other. Plaintiff, by reply, denied the affirmative defenses of the separate answers.

I. The main error assigned is the refusal of the trial court to give instructions in the nature of demurrers to the evidence requested by defendant Anton Loeffler, Sr. It is urged that the evidence of both plaintiff and defendant showed conclusively that Anton Loeffler, Jr., was driving his father's automobile at the time of the accident on the son's own mission, and not on a mission of the father, and that, at the time, the son was not the agent, servant or employee of the father. Let us examine the evidence on this point. The testimony of father and son was to this effect: At the time of the accident on November 7, 1926, the son was nineteen years and three months old, plus a few days. He lived with his parents at 5823 Southwest Avenue, St. Louis. The father owned a Willys-Knight four-cylinder touring car, and had owned it for three years prior to the accident. The father and son drove the car. November 6, 1926, was the wedding day of Miss Christine Schmidt, a niece of Mrs. Loeffler, and a cousin of Loeffler, Jr. Miss Irene Brinkmeyer, living at 4666a Rosa Avenue was to be the bridesmaid, and

Loeffler, Jr., best man. The young man testified that he asked his father for permission to use the automobile to escort Miss Brinkmeyer from her home to the home of the bride at 2000 South Third Street. The parent gave permission and, about eleven o'clock in the morning Loeffler, Jr., drove away from home. He took the bridesmaid to the Schmidt home, whence he drove the wedding party to the residence of the ministering priest where the marriage ceremony was performed. Next they rode to a photographer's, then paid some social calls, and finally at three o'clock in the afternoon the wedding party returned to the Schmidt residence and there they stayed. Whether the father allowed the son to take the automobile merely to drive the bridesmaid to the Schmidt home, or for the further ceremonial and social uses which he made of it, these privileges ended when the wedding party settled down at the Schmidt home in the afternoon. The elder Loeffler and his wife took a bus and went from their home on Southwest Avenue to the home of the bride on South Third Street, arriving there about five o'clock in the afternoon. The Loefflers, father, mother and son, took part in the wedding festivities which lasted until about half past one o'clock in the morning of November 7th. At that hour, Loeffler, Jr., found a new use of the automobile, not covered by the permission previously given. Therefore he asked his father to let him have the automobile to take home the bridesmaid, Miss Brinkmeyer, also her mother, her sister and the sister's boy friend. Permission was given and young Loeffler drove them to the Brinkmeyer home at 4666a Rosa Avenue. He then started back to the home of the Schmidts at 2000 South Third Street for the purpose of driving his parents to their own home. He had gone a number of blocks along Gravois Avenue toward the Schmidt abode to get his parents, when he ran into the Hollands at Gravois Avenue and Itaska Street.

What was said between the father and son, the two defendants, at the time that the son asked permission to take the Brinkmeyers home is important. The son, in his testimony at the trial on November 1, 1928, did not recall that the father ordered him to return for the parents, because "it was understood that he was to return for them." But the son admitted that, in his deposition given in January, 1928, he testified that, when he asked leave of his father to use the automobile to take the Brinkmeyers home, the father said: "It is all right to take them home, but come back immediately for your mother and me." To which command the son answered: "Yes, sir." The elder Loeffler, at the trial, testified that the son asked for and was given permission to take the Brinkmeyers home, but he denied that he gave his son orders to come back for him. The cross-examination of Loeffler, Sr., then proceeded as follows:

"Q. Do you remember your deposition being taken in this case? A. Yes, sir.

"Q. Do you remember this question being asked you: 'Do you recall your son asking for permission to take the Brinkmeyer people home?' A. Yes, sir.

"Q. What did he say to you? A. 'Father, can I take those people home?'

"Q. He said: 'Father, can I take those people home?' A. Yes, sir.

"Q. And what did you say? A. I said yes.

"Q. Did you add anything about coming back for you? A. Not that I remember.

"Q. You heard your son testify? A. I did.

"Q. He testified that you said: 'Come back and get mother and me.' A. I can't remember that any more.

"Your answer is, 'I can't remember that any more, that I said that.'

"Q. You wouldn't say you did not say it, though? A. I couldn't truthfully say it.

"That was correct at the time? A. Yes, sir."

The plaintiff, in rebuttal, read in evidence those parts of the depositions of both defendants which have been quoted. The elder Loeffler also testified that, at the time that the accident happened, he was still at the Schmidt residence, although the wedding party broke up at the time that the son departed to take home the Brinkmeyers. The street cars and busses were running seldom if at all at 1:30 o'clock in the morning. It is our view that it was a submissible question for the jury to determine whether, at the time of the accident, Loeffler, Jr., was upon a mission of Loeffler, Sr., and was acting as his father's servant. The father was entitled to the services of this nineteen year old son, and the jury took the view that the son, obedient to the father's orders, was rendering these services when the Hollands were struck. If the son had driven the bridesmaid to her home and if he was proceeding to his own home when the accident happened, it might well be said that he was on a social or pleasurable mission of his own, that he was not doing the business or obeying the orders of his father at the time and that the elder Loeffler was not liable. But the jury was justified under the evidence in finding that when the father gave the son permission to take home the bridesmaid, he coupled this privilege with the command to return for him and the mother. And the son was performing this duty to so return for his parents when the accident happened.

Appellants lean heavily upon Hays v. Hogan, 273 Mo. 1, 200 S. W. 286. This case was decided by this court in 1917, at a time when

some of the appellate courts were disposed to hold liable in damages the owner of a pleasure car for injuries caused while it was being driven by a member of his family for the pleasure or purposes of the driver. In this case the elder Hogan was away from home when the death for which suit was brought occurred. One of his sons was driving the family automobile upon a mission of his own, unknown to the father and in violation of the parent's standing order that the young man should not have the use of the car except by express permission in each instance. After a thorough review of the authorities, this court ruled 273 Mo. l. c. 24:

"After a careful consideration of all the authorities cited, we have reached the same conclusion, and hold that the mere ownership of an automobile purchased by a father for the use and pleasure of himself and family does not render him liable in damages to a third person for injuries sustained thereby, through the negligence of his minor son while operating the same on a public highway, in furtherance of his own business or pleasure; and the fact that he had the father's special or general permission to so use the car is wholly immaterial."

It may be conceded that young Loeffler was acting in furtherance of his own business or pleasure in taking the bridesmaid home, but he was obeying his father's command to return for the parents when the accident happened.

Bolman v. Bullene (Mo.), 200 S. W. 1068, is urged by appellants in support of their view of this case. Defendant Bullene kept an automobile for family use and pleasure for years. At the time of the accident, defendant's daughter and her husband, Throckmorton, and infant child formed part of defendant's family. Defendant and also his daughter and his son-in-law drove the car, but defendant claimed that he had instructed his daughter and son-in-law not to use the car except with his express permission. On the day of the accident, Dudley Kincaid, a friend of Throckmorton, called up and said that a friend of his, Jack Brandt, had broken down at a point in Kansas City, and wanted a wrench. Throckmorton asked permission to use the car for the purpose of taking the wrench to the place stated, a distance of three or four blocks. Defendant gave the permission and told Throckmorton to put up the car in the garage when he returned from the delivery of the wrench. Throckmorton went to the place of the breakdown and found that his aid was not wanted. Throckmorton, instead of returning home, went to the home of his friend Kincaid, three miles distant and took Kincaid in the car for the purpose of going to the Commerce Building, four or five miles away from appellant's house. On the way, Throckmorton collided with the car in which plaintiff was riding. This court, upon the authority of Hays v. Hogan, supra, reversed the

judgment against defendant. The court pointed out that the defendant permitted Throckmorton to use the car to go a few blocks to deliver the wrench, which was not for any purpose of defendant, but was for the purpose of enabling the son-in-law to do a favor for a friend. The court pointed out that, even if Throckmorton in the errand with the wrench, was defendant's servant, he had gone far beyond his permission when the accident occurred.

Guthrie v. Holmes, 272 Mo. 215, 198 S. W. 854, was a case in which defendant, having ridden in one of his automobiles to the railroad station in Kansas City, gave his chauffeur specific parting orders to take two of defendant's friends to their offices and then to drive the car to defendant's home. It took the chauffeur ten minutes to deliver defendant's friends to their offices, and he might have driven the car home in half an hour. Instead he went joy riding and carousing and he had an accident out of which the suit grew six hours after his employer had left.

In Buskie v. Januchowsky (Mo. App.), 218 S. W. 696, upon which appellants also rely, the only evidence in any way connecting the defendant with the accident was that he owned the automobile which was a pleasure car for the use of the family and had given his son permission to use it. "Under these facts, it is the settled law of this State that the defendant cannot be held liable in damages for the negligent act of his son in operating the motor car."

Keim v. Blackburn et al. (Mo. Sup.), 280 S. W. 1046, has not been cited by appellants. In this case there was judgment against defendant Roach, who was driving the car, but a demurrer was sustained as to Blackburn, the defendant owner, and as to his daughter who was riding with Roach in her father's car. This judgment was affirmed. It was held that where the automobile which caused the injury had been taken by the owner's daughter and her guest without the knowledge of the owner, he was not liable to the injured person. This case rightly declares that the reports are full of cases holding that where a servant, even with his master's consent, takes the latter's car and uses it for his own purpose and thereby injures another, the master is not liable. And it was held in this case that there was no evidence that the owner had any knowledge of the use of the car "or that either his daughter or Roach were at the time his agents or servants."

But, it is our view that, without any abatement of the rule of law laid down in the foregoing cases, it was for the jury to determine in this case whether, at the time and place of the accident, Loeffler, Jr., was in the performance of a duty imposed by Loeffler, Sr., and that the jury rightly settled this issue of fact.

If the son were at home and if the father telephoned him to take the car and to call for the parents at the Schmidt home, and if the

accident out of which this suit arose occurred while the son was going from the home for his parents, it could hardly be questioned that the father would be liable if the son, his servant for the time being, was liable. Or if the father gave the son the privilege to drive the Brinkmeyers home and at the same time told the young man that after performing this mission he might go where he pleased, and if the father intercepted the son at the Brinkmeyer residence with a telephone order not to go elsewhere but to return to the Schmidt residence for the parents, and if on this return journey death and personal injury were caused by the negligence of the son, the father would be liable. The facts found in this case should be governed by the same principles as these two hypotheses. The father gave the son the use of the family automobile for a mission of the son's own, but the father coupled this privilege with an order to return for him. An automobile is rarely so needful to an owner as when he and his wife are a long distance from home at half past one on a crisp, cold morning such as the testimony shows the morning of November 7, 1926, was. The son made his own use of the car when he set down the Brinkmeyers at their home and then he undertook to make use of it for his father's purpose.

In reaching the conclusion stated, we do not take the view of respondent that "the doctrine announced in Hays v. Hogan, supra, has been greatly liberalized by the Supreme Court in the more recent case of Barz v. Fleischmann Yeast Company, 308 Mo. 288, 271 S. W. 361, where it announced that proof of ownership of an automobile makes a prima-facie case for plaintiff against the owner." In the Barz case the automobile was a delivery truck bearing the name of the defendant company. It was being driven by a hired servant of the defendant, and it was a question of fact whether the servant was taking the truck for the sole purpose of going to lunch or for the further purpose of making some deliveries for his master. We have seen that the automobile used in Hays v. Hogan was a family pleasure car. Nor should the opinion in the instant case be interpreted as an approval of certain recent appellate court decisions holding, with respect to family pleasure automobiles, upon the authority of Barz v. Yeast Company, supra, that proof of ownership is sufficient to charge the head of the family with responsibility for the management of the car, by a member of the family, and that the truth of the evidence purporting to disprove the inference of agency created by ownership is for the jury. Such a case is McCarter v. Burger et al. (Mo. App.), 6 S. W. (2d) 979, where the defendant Burger was driving the family automobile of his father-in-law and codefendant, Takasch.

The decision here is grounded upon the principles of common law which underlie the opinions in Hays v. Hogan, supra, and the other

cases cited by appellant, and heretofore mentioned. The general rule of the common law is that the father of a minor child cannot, on the mere ground of the parental relationship, be held liable for an injury caused by the tortious act of the child. But the operation of this general rule may be avoided by proof that at the time when the injury was inflicted the child was employed by the father in the capacity of a servant or agent either generally or with respect to the particular piece of work then in progress and that the act from which the injury resulted was done in the course of that employment.

A case which applies these principles is Broadstreet v. Wall (1907), 168 Ind. 192, 10 L. R. A. (N. S.) 933, 120 Am. St. 356, 80 N. E. 145. This was an action for injuries received by a foot passenger who was run over by the defendant's horse which his minor son was using to·carry a message from the father. It was held that, by employing the boy in this manner the defendant must be taken to have created, to the extent at least of the errand, the relation of master and servant between him and his son. Accordingly the father under the third paragraph of the complaint was ruled to be responsible for the injuries resulting from the inability of the son properly to control or manage his horse or under the first paragraph on account of the son's negligence in riding the horse along the public highway while engaged in the performance of the business of his father.

And these rules of law are thus summarized in 46 Corpus Juris, 1331:

"Where a parent authorizes the child to act as his agent or servant in any matter, he is liable for the torts committed in the course of the employment but not for acts which are not within the scope of his authority or employment. This liability does not grow out of the relation of parent and child but is based upon the relation of principal and agent or upon that of master and servant and is governed by the rules applicable to such relations."

The several assignments of error predicated upon the proposition that there was no proof of a relationship of master and servant between the appellants are ruled against them.

II. The court, at the instance of plaintiff, gave two instructions (one for each count) on the theory of the humanitarian doctrine. Both of these instructions tell the jury that if before the collision and injury the driver of the automobile saw, or by the exercise of a high degree of care on his part could have seen the plaintiff and her husband, in time thereafter, by the exercise of care with the means and appliances at hand, and with reasonable safety to said automobile and

its occupants, either to have stopped the said automobile, or to have slackened the speed thereof, or swerved the same so as thereby to avoid striking and injuring plaintiff and her husband, and that the driver of the automobile failed to take either or any of said precautions and that as a direct result of said failure, plaintiff and her husband were struck and injured, etc., then the defendants were liable. Defendants complain that these instructions do not require the jury to find all of these alternatives, but predicates a right of recovery upon the finding of "either or any of said precautions." The court, in Instruction No. 3, given at the instance of defendants, hypothesized these precautions in the same alternative manner. And it would seem to be impossible for a jury to understand any other than an alternative presentation of these precautions.

III. The defendants also complain that in the two main instructions given at the request of plaintiff the court did not define the words "scope of a duty, business and agency of his father." That part of the instruction is as follows:

"And if you further find and believe from the evidence that the said automobile at the time and place mentioned in the evidence was being driven and operated by said defendant, Anton Loeffler, Jr., with the consent and knowledge of his father, the defendant, Anton Loeffler, and in the line and scope of a duty, business and agency of his father, the defendant, Anton Loeffler, then your verdict, under the first count of the petition must be in favor of the plaintiff and against both defendants, even though you should further find and believe that plaintiff's husband himself was guilty of negligence in getting into the way of the said automobile."

If it be assumed for the sake of argument alone that these words should have been defined, whatever harm may have been done by failure of the court to give an instruction of definition was cured by the simple words of defendant's given instructions 4 and 5. The latter instruction directed the jury to return a verdict for defendant Loeffler, Sr., if the jury should find and believe from the evidence "that at the time and place mentioned in the evidence that the defendant Anton Loeffler, Jr., after taking his companion, Miss Brinkmeyer, her mother, sister and another friend, to their home, was returning to the Schmidt home, and while so returning was not acting under orders, directions or instructions from his father, Anton Loeffler, Sr."

No prejudicial error being found, the judgment is affirmed. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by FITZSIMMONS, C., is adopted as the opinion of the court. All of the judges concur.