CLARA SWEAT, ADMINISTRATRIX OF THE ESTATE OF TOME SWEAT, RE-SPONDENT, v. R. F. BROZMAN AND WILLIAM BRYANT, DOING BUSI-NESS AS AMERICAN CAR SALES COMPANY, APPELLANTS.—198 S. W. (2d) 531.

Kansas City Court of Appeals. December 2, 1946.

*Langworthy, Matz & Linde, Clyde J. Linde,* and *Daniel S. Millman* for appellants.

1050

*Ben W. Swofford, Robert L. Jackson, Ronald Shankland, Francis L. Roach,* and *Laurence R. Smith* for respondent.

CAVE, J.—This is a suit filed by Tome Sweat for damages for personal injuries suffered in an automobile collision. At the trial the jury returned a verdict in his favor in the sum of $4500; a remittitur of $2,000 was made, and judgment entered against all defendants for $2,500. After the trial Tome Sweat died and his widow, Clara Sweat, as administratrix, was substituted as plaintiff.

The cause was commenced against Donald Bishop, an individual, R. F. Brozman and William Bryant, as co-partners, doing business as American Car Sales Company, Joseph Eckler and Dorothea Eckler,

as co-partners, doing business as Eckler and Eckler, but at the beginning of the trial plaintiff voluntarily dismissed as to Dorothea Eckler.

The petition alleged that defendant Donald Bishop negligently operated an automobile so as to cause a collision with plaintiff's automobile, and that said defendant Donald Bishop was acting as agent, servant and employee of defendants Joseph Eckler and Dorothea Eckler, and as the agent of defendants Brozman and Bryant, doing business as American Car Sales Company, and that defendant Joseph Eckler was also acting as the agent, servant and employee of defendants Brozman and Bryant. Defendants Brozman and Bryant filed joint separate answers admitting they were engaged in a partnership, known as American Car Sales Company, but denying that either Donald Bishop or Joseph Eckler was acting as their agent, servant and employee; also denying that they or any of the other defendants were negligent.

Brozman and Bryant are the only parties appealing from the judgment. The points and authorities relied on by them for a reversal of the judgment make it unnecessary for us to review the evidence touching the question of negligence or the injuries received.

Appellants charge that the court erred in not sustaining their motions for a directed verdict at the close of plaintiff's evidence, and at the close of all the evidence because, (a) plaintiff's evidence proved that appellants were bailors of an automobile, and as such were not liable for the negligence of a prospective purchaser; (b) plaintiff failed to prove that Joseph Eckler and Donald Bishop were agents or employees of appellants.

It is conceded that at the time of and prior to the accident appellants Brozman and Bryant were partners, doing business as American Car Sales Company, operating a used car agency in Kansas City, Missouri, and buying and selling used automobiles; that the Cadillac car involved in the accident was owned by them and was one of several cars they had for sale; that at the time of the accident this car was carrying duplicate dealers' license plates issued to the partnership as a used car sales agency; that it was being driven at the time by the defendant Bishop, and that defendant Joseph Eckler was riding in the car with him. It is also conceded or undisputed that Biship and Eckler were not *general* or *regular* employees of the appellants at the time of the accident, and therefore no presumption of agency arose merely because they were operating the car.

But respondent contends that his evidence proves that Eckler became the agent of appellants, because of certain facts now to be noted. Defendants Eckler and Bryant had been friends for three or four years before the date of the accident, and on the Sunday preceding, Bryant had driven the Cadillac car to Eckler's home, where Eckler and Bishop had seen it and Bishop became interested in buying it. Late in the afternoon of the day before the accident, Eckler came to

appellants' place of business and drove the car away under the facts and circumstances detailed as follows:

Bryant's testimony:

"Q. Well, with specific reference to February 1, 1944, did Mr. Eckler take a car that was owned by your company for any purpose? A. I let him take one car, I believe. I have loaned him a car at different times. I believe it was in February; I can't tell the exact date.

"Q. Did you *loan* Mr. Eckler a car that was involved in an automobile accident on February 2, 1944? A. I let him take the car out. He wanted to show it to a couple of people that he knew. . . .

"Q. What were the circumstances under which you let him take the car? A. Well, he come in, said he would like to use.that car and show it possibly to a couple of people he knew, a friend of his and another party, and he wanted to drive the car if it was all right, that they might be interested in buying it. They had asked him, it seems as though, to kind of look around for a car and he knew I had them and I showed him what I had and I let him take the car out. . . .

"Q. I say did you and he go out on the lot? A. Yes, sir. . . .

"Q. And did you look them over with him? A. No; he just looked them over and thought possibly—I says, 'well, what kind of a car do you think he would be interested in or you want to look at?' and he said, oh, he would like to use that Cadillac. I don't know whether he wanted to show it to them right that evening or not, but he left his car there, I think, on the lot. . . .

"Q. Did he tell you who he wanted to show it to? A. I think he mentioned Donald Bishop might be interested in it and also a man by the name of Hunter, Todd Hunter. I asked him, naturally I would ask him about it, and he wanted to drive the car and I said, 'Well, you can drive it,' and—

"Q. (Interrupting) What did you ask him about it? You say you naturally asked him about it. A. He said, well, he would be back. I don't know, I might have asked him—I think I did ask him who he wanted to let ride in the car and he said, well, he didn't know, he would show it to Hunter, he thought, and Bishop. . . .

"Q. Mr. Bryant, you are the one who knows whether you loaned it to Eckler for his own use or to show it to Hunter and Bishop. A. I think it was both.

"Q. I am asking you what your purpose was when you let him have the car and you are the only man who knows that. A. I let him have it, maybe if these people liked the automobile, the mechanical condition was so it suited them, they might come around in a few days and make a deal on it.

"Q. You had that thought in mind, did you? A. I always got a thought about any car I got, that thought is always foremost in my mind any time.

1054

"Q. And you ran true to form on this Cadillac by thinking of that? A. Well, I expect maybe I did. I have always got that thought in my mind.

"Q. Why certainly. And he specifically mentioned to you the name of Todd Hunter, you say? A. Yes. I asked him who he thought might look at it and he mentioned Todd Hunter.

"Q. And did he mention Donald Bishop? A. And Bishop. . . .

"Q. Did Mr. Eckler make any statement to you about where they were headed for or where they were going at the time this accident occurred? A. I believe he told me they was bringing the car back down to return it to me and pick up his car. I expect he intended to. I didn't ask him.

"Q. And he told you Bishop was driving? A. Yes.

"Q. Because he wanted to see how the car ran? A. Apparently wanted to—yes, I think that is what he was doing, driving it to see how it operated.

"Q. That is what Eckler told you, isn't it? A. That is what he told me. I asked how he come to be driving it, yes. Of course I left it to Eckler's own judgment to let him drive the car; that was all right. . . .

".Q But you were leaving that to his judgment, weren't you? A. Yes, I was leaving that to his judgment.

"Q. You had confidence in his judgment to select the proper kind of prospective buyers, didn't you? A. Well, yes, I think he would know.

"Q. Did Eckler tell you that he was riding with Bishop when the accident occurred? A. Yes, he was riding with him; he was sitting in the front seat with him. . . ."

Mr. Eckler testified:

"Q. Now, will you relate the circumstances under which you picked up that Cadillac the night before, which would be February 1? A. Well, Todd Hunter had been wanting a car and Donny had been wanting a car.

"Q. And who? A. Don, that is Don Bishop. And I believe that Todd had seen it. I don't know where he had seen it, but he had a Buick he wanted to trade in and I knew Todd was after a car. And Todd is a friend of mine and also a friend of Bryant's, and Bishop wanted a car, and I thought maybe it was a little too much money because I could tell—but I thought it was too much money for the car for Don to put into a car, but he wanted it and said he would like to get it if he could make a deal on it, and—

"Q. (interrupting) You are talking about Don Bishop? A. I am talking about both of them. Do you want me to take them one at a time?

"Q. No. I don't care how you take them. I just want to understand who you are talking about. A. There were two fellows that

liked the car. I picked up the car and then went over to the Missouri Hotel and picked up Don and then we drove out to Todd Hunter's, that is out to the Plantation on Highway New 40. Todd had purchased a Buick sedan about an hour and a half before I got up there with it from some other friend of his, and so Don said, 'Well, I think I will try to make a deal on it.' . . . We took the car home that night, Don drove the car home, and the next morning we came in to town. . . . And then we proceeded to go downtown to take the car back. Whether he would have made a deal with Bryant or not I don't know.

"Q. Let's get back to the night before. Wh(e)y had you gone to the American Car Sales Company that evening? A. Well, Bishop liked that car and Hunter was in the market for a Buick or a Cadillac. . . . I knew it was a nice car and I knew Todd might be interested in it. I knew Don was interested in it; he saw it. . . .

"Q. And you went from your office in the Missouri Hotel over to see Mr. Bryant, is that right, that evening? A. I don't know whether I went from the office or from somewheres else, but I went to his place of business and left my car there and was going to take this out and let Hunter see it and let Bishop see it, as a favor to Bill—Bill is a friend of mine and they are friends of mine, or were then—and see if they couldn't make a deal on the car.

"Q. And the purpose, then, in your going to Bill's place was to pick up this car to show it to Hunter and Bishop? A. Just an accommodation of friends, that is all.

"Q. And you had no arrangements about money? A. I wouldn't accept it if he offered it. He was a friend of mine. . . . .

"Q. He (Bishop) knew you were getting it? A. He knew I was getting it.

"Q. How did he happen to know it? A. He had been wanting to buy the car and he asked me two or three times, talked about it, and his sister tried to dissuade him from it, not to spend so much money for a car, and so he asked me if I wouldn't get it so he could drive it and see what it was like. You can't tell much about a car by looking at it, you know, and he being a mechanic he was interested in looking it over.

"Q. When did he ask you to get it so he could drive it? A. I think maybe it was the next day or that Sunday that Bryant was out to the house.

"Q. And the day you went there you told him you were going to get the car? Is that it? A. He knew I was going to get it. . . .

"Q. Had you made any arrangements with Bryant as to when you were going to bring this car back? A. Well, I don't remember exactly. I don't recall, but I imagine, I think I told them at the time that if Todd like(d) it I would let him take it, and if not we would bring it back that night or the next day. Todd was pretty hot for a car, he wanted a car and he wanted something really good, and I was under

the impression that was a pretty good car. And both of them being friends of mine, as well as of each other, I did' it as an accommodation.

"Q. Well, were you supposed to bring the car back that night or the next day or either one? A. Well, whenever I wanted to.

"Q. You had no definite understanding? A. No, because I might have left it with Hunter if Hunter hadn't purchased a car, he would have driven it a day or .two and made an arrangement with Bryant on a sale. . . ."

Mr. Bishop testified:

"Q. Did you drive home, out to Quivira, that night in that car? A. Well, we did after we saw Mr. Hunter.

"Q. Who is Mr. Hunter? A. Well, he was the one that was to buy the car.

"Q. You were going to sell this car, were you? A. Yes. . . .

"Q. Did he request you to drive this car th's particular morning? A. Yes.

"Q. The morning of the accident? A. Y 's. . . .

"Q. And you were acting as a chauffeur for your brother-in-law? A. If you want to call it that.

"Q. You didn't have any particular mission of your own that you were on at that time? A. No.

"Q. Did you overhear any of the conversation between Mr. Eckler and Mr. Bryant as to the reason that the car was being taken out? A. No, not at the time.

"Q. You didn't know anything about that? A. No.

"Q. You understood it was in connection with the sale of the car to somebody? . . . A. I heard one time, Mr. Eckler told me they were going out there to sell the car.

"Q. Is that who told you about it, Mr. Eckler? A. Yes.

"Q. That is your brother-in-law? A. Yes.

"Q. When was that? A. That was that afternoon.

"Q. That is the afternoon that you got into the car? A. Yes. . . .

"Q. When were you going to take it back? Did you have any plan in regard to taking it back? A. Well,.I had no plans at all about the car. That was Mr. Eckler, and I was going where he told me to."

Appellants objected to the introduction of the evidence of Eckler and Bishop, but in view of the conclusion we have reached, it will be unnecessary to discuss or decide that question.

Appellants offered no' testimony contradicting plaintiff's evidence concerning agency. Therefore, the question confronting us is whether plaintiff's evidence is sufficient to make a submissible issue of agency. This is not a case where the driver of the car was a *general employee* of the owner, which gives rise to certain presumptions, and cases discussing such a situation are of little aid in deciding the question of agency in this case. Some of such cases are: Sowers v. Howard (Mo.), 139 S. W. (2d) 897; State ex rel. Kurz v. Bland, 333 Mo. 941, 64 S. W.

(2d) 638; State ex rel. Waters v. Hostetter, 126 S. W. (Mo.) (2d) 1164.

It is conceded that if the relationship between appellants and Eckler was that of bailor and bailee, then appellants could not be held responsible to a third person for injuries resulting from the bailee's negligent use of the car. [Saunders v. Prue, 151 S. W. (2d) 478, 482; Tourkakis et al. v. Billman, 71 S. W. (2d) 1084; 6 Am. Jur., Secs. 300, 311, 312 and 313; also, 42 C. J., Sec. 858 bb.] It is also the settled law of this state that the owner of a pleasure car cannot be held liable in damages for the negligent act of one who is operating such car with *merely his consent,* in the absence of proof that the driver was operating it at the time in question as agent or servant of the owner and engaged in the owner's business. [Tourkakis et al. v. Billman et al., *supra;* Murphy v. Loeffler, 327 Mo. 1244, 39 S. W. (2d) 550; State ex rel. Kurz v. Bland, *supra;* Mulanix v. Reeves, et al., 112 S. W. (2d) 100.]

In deciding the question whether the evidence proves agency, the general rule is that where the material facts from which agency is to be inferred are undisputed, and only one conclusion can be reasonably drawn from them, then the question of agency is one for the court; otherwise—it is a question of fact to be determined by the jury. [Schneider v. Dubinsky, 344 Mo. 654, 127 S. W. (2d) 691, 694.] If the evidence be considered as a whole, and not by isolated fragments, it seems to us there can be but one conclusion reasonably drawn from the undisputed facts. Bryant (appellant) *"loaned"* the car to Eckler who wanted to show it to two of his friends, Hunter and Bishop, both of whom "liked the car" and had *asked* Eckler to get it so they could examine and inspect it. It was at the suggestion of Hunter and Bishop that Eckler procured the car from Bryant. If Eckler was acting as the agent of anyone it was for Hunter and Bishop. The mere fact that Bryant *"hoped"* that Hunter or Bishop might later come in and purchase or make a trade for the car is not sufficient evidence, under all the facts, to constitute Eckler the agent of appellants.

Eckler said he did what he did as "an accommodation among friends," and when asked, "and you had no arrangement about money? he replied, "I wouldn't accept it if he offered it. He was a friend of mine." An agency is defined by American Law Institute as "the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act." [Restatement, Agency, Par. 1.] It seems clear that Eckler did not act on behalf of appellants, or under their control, but was acting for Bishop and Hunter and made the *same* arrangements with Bryant to drive the car for inspection purposes that Bishop or Hunter, as prospective purchasers, would have made had either called in person and asked to drive the car with a view of buying. Under such circumstances the relationship of bailor and bailee was created and the bailor (appellants) would not be liable

to a third person for the negligence of the bailee. See authorities, *supra.*

There was no discussion between Bryant and Eckler concerning the price of the car or any terms or conditions upon which it could be sold or traded. Eckler had no authority to make any sort of sale or trade which would be binding on the appellants.

Respondent cites and relies upon authorities which announce the general proposition that agency may be implied and shown by the conduct and acquiesence of the principal, or from the course of business between them, and their actions in the course of their business dealings. We have no quarrel with such a proposition but where the evidence seeking to establish agency is undisputed and only one conclusion can be reasonably drawn from it, then there is no place for a presumption.

In Horn v. Rhoads, 296 S. W. 389, the Supreme Court discussed at considerable length facts which, in our opinion, are more favorable to plaintiff concerning agency than are the facts in this case, and held that they were insufficient to prove agency and reversed the judgment.

We are forced to the conclusion that the trial court should have sustained appellants' motion for directed verdict. It follows that the judgment against these two appellants should be reversed. It is so ordered. All concur.