Donald J. MEIER, and Kathleen Meier,
Plaintiffs/Appellants/Cross–
Respondents,

v.

Jonathan D. SCHROCK, Defendant,

and

David E. Schrock,
Defendant/Respondent/Cross–Appellant.

No. ED 98728.

Missouri Court of Appeals,
Eastern District,
Division Two.

May 7, 2013.

Motion for Rehearing and/or Transfer
to Supreme Court Denied June
11, 2013.

Application for Transfer Denied
Aug. 13, 2013.

David George Bandre', Bandre, Hunt & Snider, Jefferson City, MO, for David E. Schrock and Jonathan David Schrock.

Andrew Jay Gelbach, Christopher Paul Sweeny, Co–Counsel, Warrensburg, MO, for Donald John Meier and Kathleen Meier.

## OPINION

MARY K. HOFF, Judge.

Donald J. Meier (Mr. Meier) and Kathleen Meier (Mrs. Meier) (collectively referred to as Plaintiffs) appeal from the trial court's judgment awarding only the amount of Mr. Meier's medical bills and Mrs. Meier's loss of consortium claim but nothing for Mr. Meier's pain and suffering for injuries following an automobile accident. David E. Schrock (Father)[1] cross-

---

1. For ease of reading, we refer to David Schrock and Jonathan Schrock as Father and Son, respectively.

appeals from the trial court's judgment on Plaintiffs' petition alleging that Father was vicariously liable for Plaintiffs' injuries caused by his son, Jonathan, (Son) during the same accident. We reverse and remand the trial court's judgment with regard to its award for Mr. Meier's pain and suffering. We also reverse the trial court's judgment with regard to its finding that Father was vicariously liable for Plaintiffs' injuries. The remaining judgment is affirmed.

### Factual and Procedural Background

On Saturday, July 11, 2009, at approximately 9:00 a.m., Son was traveling southbound on Missouri Highway 89. Son, who was 16 years old and a licensed driver, was driving a pickup truck owned by Father. Saturday was Son's day off from his job at Classic Buildings, where he helped build mini-barns. On this particular Saturday, Son had decided to not accompany his parents and siblings on a trip to Iowa but instead to drive from his family's home to the construction site of a new family home, approximately six miles away. Son intended to observe an insulation contractor install foam insulation at the new family home and possibly help "if [the contractor] needed help."

Meanwhile, Mr. Meier was a passenger in a dump truck traveling northbound on Missouri Highway 89. As the dump truck and Son's truck approached each other from opposite directions, Son was looking down at his cell phone, intending to call Father. Suddenly, Son felt the truck hit a bump, and the truck's steering wheel jerked. In actuality, the truck had not hit a bump; rather, a tire had gone off the paved road surface. Son overcorrected the turn of the steering wheel to get the truck's tire back onto the paved road surface, causing him to cross the centerline into the path of the oncoming dump truck.

The driver of the dump truck saw Son's truck driving in the wrong lane and tried to move as far to the right as possible, but he was unable to avoid the collision. The dump truck struck the left rear section of Son's truck then turned to the left and skidded on its right-side tires. The dump truck slid off the road and turned onto its right side, severely injuring Mr. Meier, who had been sitting in the passenger seat. Son's truck slid off the road in the opposite direction and turned onto its side. Both vehicles were heavily damaged and had to be towed from the scene. Son subsequently received a citation for causing the accident, to which he pleaded guilty and paid a fine.

Mr. Meier was taken by ambulance to a local hospital and later by helicopter to a regional hospital, where he underwent surgery. Mr. Meier sustained substantial and permanent injuries, including a traumatic brain injury, an open radial fracture of his right arm requiring multiple surgeries, severe bruising, rib fractures, a collapsed lung, and lacerations of his scalp. Mr. Meier remained hospitalized for 11 days. Mr. Meier then moved to a rehabilitation facility for seven days where he received intensive therapy to learn to walk again.

Plaintiffs thereafter filed their petition for damages resulting from the accident caused by Son. During the bench trial, Plaintiffs asked the trial court to award $3.3 million for medical costs, pain and suffering, and Mrs. Meier's loss of consortium due to Mr. Meier's injuries. After hearing all of the evidence and considering the exhibits, arguments, and post-trial briefs of the parties, the trial court entered its judgment finding that Son was 100 percent at fault for causing the accident and Plaintiffs' injuries and damages. The trial court further found that (1) Father controlled and had the right to control the conduct of Son at the time of the accident;

(2) Son was an agent of Father and acting on behalf of Father's interest and at Father's direction; (3) Father was, therefore, liable to Plaintiffs for damages resulting from Son's negligence; (4) Mr. Meier was entitled to $313,077 for his past medical bills and $76,000 for his future medical bills; (5) Mr. Meier was entitled to "nothing for his injuries, disabilities, disfigurement, and pain and suffering"; and (6) Mrs. Meier was entitled to $100,000 for her loss of consortium claim due to Mr. Meier's injuries.

This appeal and cross-appeal followed. Additional facts will be discussed as necessary to our analysis of the issues on appeal.

### Standard of Review

■ In a bench-tried matter, the trial court's judgment will be upheld unless there is no substantial evidence to support the judgment, the judgment is against the weight of the evidence, the judgment erroneously declares the law, or the judgment erroneously applies the law. *Coleman v. Mantia*, 25 S.W.3d 675, 676 (Mo.App. E.D. 2000), *citing Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

### Damages for Pain and Suffering

■ In their sole point on appeal, Plaintiffs claim the trial court erred in failing to award Mr. Meier damages for his pain and suffering because, generally, awards for medical expenses that fail to account for pain and suffering are invalid and because Mr. Meier's pain and suffering from severe and permanent injuries were substantial and undisputed.

■ The amount of damages to be awarded in a personal injury case is left to the discretion of the trial court. *Davidson v. Schneider*, 349 S.W.2d 908, 912 (Mo. 1961); *Root v. Manley*, 91 S.W.3d 144, 147 (Mo.App. E.D.2002). We will not disturb the trial court's determination on the issue of damages unless the award is manifestly unjust or the amount awarded is so shockingly and grossly inadequate as to indicate passion or prejudice. *Davidson*, 349 S.W.2d at 912; *Root*, 91 S.W.3d at 147; *Deck v. Kovac*, 864 S.W.2d 423, 425 (Mo. App. E.D.1993).

■ Generally, an award of medical expenses alone without an award for pain and suffering is invalid and will be set aside "almost as a matter of course." *Davidson*, 349 S.W.2d at 913; *Root*, 91 S.W.3d at 146. The fact finder is bound to award damages commensurate with the nature and extent of the plaintiff's injuries. *Davidson*, 349 S.W.2d at 913.

Here, Mr. Meier suffered extensive injuries, which had only one apparent cause, Son's negligence. As a result, Mr. Meier experienced pain and suffering, evidence of which was adduced at trial through the testimony of Mrs. Meier, Mr. Meier's son, and Mr. Meier's friend, as well as the deposition testimony of three of Mr. Meier's doctors.

Mrs. Meier testified that, before the accident, she and Mr. Meier would grocery shop, go fishing, and socialize with friends. Mrs. Meier testified that, before the accident, she and Mr. Meier had a loving relationship and that they wanted to travel during their retirement. Mrs. Meier testified that she was taken to the hospital to see Mr. Meier a short time after the accident and he "really [did] not look well" and was wearing a neck brace. Mrs. Meier testified that medical personnel placed a tube in Mr. Meier's chest while he awaited surgery for the fracture in his right arm. Mrs. Meier testified that before he underwent surgery, Mr. Meier "kept saying [he] just hurt." Mrs. Meier further testified that Mr. Meier stayed in the hospital for 11 days following surgery then stayed sev-

en days in a rehabilitation facility. Mrs. Meier testified that Mr. Meier received therapy at the rehabilitation facility to learn how to walk again and to do daily activities. Mrs. Meier testified that Mr. Meier's "legs were totally black," he had "sores on his stomach from his ribs," "his back hurt him really bad," "his arm was just all wrapped," and he had stitches in his head. Mrs. Meier testified that Mr. Meier needed assistance going to the restroom and needed help getting up and down from a chair. Mrs. Meier testified that Mr. Meier could not sleep in bed because "he was hurting so bad." Mrs. Meier also testified that when Mr. Meier later underwent bone graft surgery, "he said [the bone graft] was more painful than … the [first] surgery on his arm." Mrs. Meier testified that Mr. Meier suffered from tremors, which worsened after the accident. Mr. Meier also had difficulty remembering. Mrs. Meier testified that Mr. Meier later underwent brain surgery for placement of a stimulator to alleviate the tremors but that he still suffered from memory loss, shame, and tended to "stay to himself." Mrs. Meier testified that, at the time of trial, Mr. Meier still had back pain, had severe leg cramps, and had a permanent black spot on the back of his right leg.

Mr. Meier's son testified that Mr. Meier was outgoing, "very confident," and had a "very strong handshake" before the accident. Mr. Meier's son testified that Mr. Meier shook from tremors after the accident to such an extent that he spilled water or soda on himself in front of friends, which embarrassed Mr. Meier. Mr. Meier's son described Mr. Meier as having severe tremors following the accident and decreased strength in his arm and hand. Mr. Meier's son also described Mr. Meier as forgetful, embarrassed, and "defeated" following the accident.

Mr. Meier's friend, Dominic Barciszewski (Barciszewski) testified that he and Mr. Meier had volunteered to build a community center and that Mr. Meier had done extensive physical labor prior to the accident. Barciszewski's testimony regarding Mr. Meier's physical condition and abilities prior to the accident was consistent with the testimony of Mrs. Meier and Mr. Meier's son.

Dr. Mohamed Khalid (Dr. Khalid), an orthopaedic surgeon specializing in hand and upper extremity trauma, testified that Mr. Meier needed extended treatment, therapy, and prescription medications as a result of his injuries caused by the accident. Dr. Khalid testified that it was "quite likely" Mr. Meier would continue to suffer from the effects of the accident in the future. Dr. Khalid testified that "significant energy transferred" during the accident, resulting in a fracture of Mr. Meier's arm bone in multiple locations and a significant soft tissue injury, which had a high incidence of infection due to exposure to bacteria. Dr. Khalid also testified regarding Mr. Meier's pain from air trapped between the lungs and neck and chest cavity due to a collapsed lung, which could be "quite painful." Dr. Khalid testified that Mr. Meier had a "new onset of pain" in his wrist one year after the accident and that Mr. Meier was likely to have pain, weakness, and loss of mobility in his arm on a long-term basis. Dr. Khalid testified that it was quite likely that these symptoms could affect Mr. Meier for the remainder of his life.

Dr. Brett Crist (Dr. Crist), an orthopaedic traumatologist and an associate professor of orthopaedics, testified that, within a reasonable degree of medical certainty, Mr. Meier's injuries caused him to need extensive treatment by surgeons, non-surgeons, therapists, and hospitals following the accident. Dr. Crist testified

that Mr. Meier would continue to suffer from the effects of the accident for the rest of his life. Dr. Crist testified that he began treating Mr. Meier several weeks after the accident. Dr. Crist testified that the fracture in Mr. Meier's right arm had not healed even though Mr. Meier had undergone surgery for the injury following the accident. Dr. Crist testified that the broken parts of the bone in Mr. Meier's arm were not rejoining because the blood supply to the bone also had been injured. Dr. Crist testified that he performed a bone graft surgery on Mr. Meier several months after the accident. Dr. Christ took a graft from Mr. Meier's pelvic bone and inserted into his arm to try to stimulate healing. Dr. Crist also inserted a plate and screws into Mr. Meier's arm to hold the bone in position to make the graft stable and to encourage the arm to heal. Dr. Crist testified that, the bone shortened as it healed, placing increased pressure on the ligaments and bones in his wrist and causing him pain. Dr. Crist testified that Mr. Meier experienced increased pain with increased use of his arm and wrist and during physical therapy.

Dr. Thorkild Norregaard (Dr. Norregaard), a neurosurgeon, testified that Mr. Meier's tremors were caused by a closed-head injury resulting from the accident. Dr. Norregaard testified that Mr. Meier's tremors were possibly genetic but dramatically worsened after the accident. Dr. Norregaard testified that Mr. Meier's tremors were so severe following the accident that Mr. Meier could not drink a glass of water. The severity of the tremors required the permanent placement of a brain stimulator in Mr. Meier's brain in conjunction with the placement of a pulse generator in Mr. Meier's chest to control the tremors. Using anatomical models, Dr. Norregaard described the manner in which he drilled holes in Mr. Meier's skull to implant the electrodes of the brain stim-ulator into the deepest center of the brain. Dr. Norregaard testified that the pulse generator in Mr. Meier's chest must be replaced every five to six years for the remainder of Mr. Meier's life.

The trial court was required to award damages commensurate with the nature and extent of Mr. Meier's injuries. *Davidson*, 349 S.W.2d at 913. Given that ample undisputed evidence regarding Meier's pain and suffering resulting from the injuries he sustained in the accident was before the trial court, the failure to award non-economic damages was an abuse of discretion. Point granted. Consequently, we affirm the award of medical damages and loss of consortium award but reverse the judgment with regard to the failure to award damages for pain and suffering.

*Vicarious Liability*

■ In his sole point on cross-appeal, Father claims the trial court erred in determining that he was liable for the negligence of Son because Father did not control Son's actions at the time of the accident and the relationship between Father and Son did not fit into any recognized legal theory upon which Father's liability can be based. Father further argues that, even if a master-servant or employer-employee relationship existed between him and Son, the "coming and going" rule applies.

■ Generally, a parent will not be held liable for the torts committed by the parent's child. *Stonger ex rel. Stonger v. Riggs*, 21 S.W.3d 18, 21 (Mo.App. W.D. 2000); *National Dairy Products Corp. v. Freschi*, 393 S.W.2d 48, 53 (Mo.App.1965). However, a parent can be held liable for his child's actions where (1) the relationship of master and servant exists and the child is acting within the scope of his authority accorded by the parent; (2) the

parent is negligent in entrusting to the child an instrument which, because of its nature, use and purpose, is so dangerous as to constitute, in the hands of the child, an unreasonable risk to others; (3) the parent is negligent in entrusting to the child an instrumentality which, though not necessarily a dangerous thing of itself, is likely to be put to a dangerous use because of the known propensities of the child; (4) the parent's negligence consists entirely of his failure reasonably to restrain the child from vicious conduct imperiling others when the parent has knowledge of the child's propensity toward such conduct; and (5) the parent participates in the child's tortious act by consenting to it or by ratifying it later and accepting the consequences. *Stonger*, 21 S.W.3d at 21; *National Dairy*, 393 S.W.2d at 54.

▮ Here, the only applicable exception to the general rule against parental liability for torts committed by the parent's child is the master-servant relationship exception. A finding of vicarious liability based on *respondeat superior* requires some evidence that a master-servant relationship existed between the parties. *Wilson v. St. Louis Area Council, Boy Scouts of America*, 845 S.W.2d 568, 570–71 (Mo.App. E.D.1992). "*Respondeat superior* is inapplicable unless a master-servant relationship exists." *Kaplan v. U.S. Bank, N.A.*, 166 S.W.3d 60, 66 (Mo. App. E.D.2003). If the doctrine of *respondeat superior* applies, then the master is liable for damages resulting from the servant's negligent acts committed within the scope of employment. *Kaplan*, 166 S.W.3d at 66. "A master-servant relationship exists when 'the person sought to be charged as master had the right or power to control and direct the physical conduct of the other while working.'" *Id.*, quoting *Hougland v. Pulitzer Publishing Co., Inc.*, 939 S.W.2d 31, 33 (Mo.App. E.D.

1997). The relationship of servant and master begins only when the person charged as master has the right to direct the method by which the master's service is performed. *Wilson*, 845 S.W.2d at 570. "Whether a party is liable under the doctrine of *respondeat superior* depends on the facts and circumstances in evidence in each particular case and no single test is conclusive of the issue of the party's interest in the activity and his right of control." *Id.* at 570–71, *citing Sharp v. W. & W. Trucking Co.*, 421 S.W.2d 213, 220 (Mo. banc 1967).

In its judgment, the trial court found Father vicariously liable for Mr. Meier's injuries on the grounds that Son was Father's agent and that Son was acting on behalf of Father's interest and at the direction of Father by driving to the family's new home site when the accident occurred. However, the evidence at trial did not support the existence of a master-servant relationship. Son was not Father's employee or agent at the time of the accident. The evidence at trial established that Son was employed by Classic Buildings during the week and that Saturday was Son's day off. Father testified that he also worked for Classic Buildings, and he and Son worked "side by side" during the work week. The evidence showed that Father also was self-employed and that Son sometimes worked with Father building homes, sheds, and pole barns and remodeling. The evidence established that Son earned wages from his work for Classic Buildings but that Father kept a portion of Son's wages and paid Son an allowance each week. Father also paid Son an allowance when he worked with Father on other construction jobs. The evidence indicated that Father's practice of retaining Son's wages and paying Son a small allowance resulted from Father's religious beliefs, not from an employment relationship with Son. Father testified that friends from his

family's church community assisted Father in building the new family home. Father also testified that it was the custom within his family's church community to assist each other in building homes and barns. Father testified that Son sometimes volunteered to help Father at the site of the new family home on Saturdays but that Son also had free time to associate with friends or to go fishing on Saturdays. Father specifically testified that he did not pay Son any wages or trade anything of value in return for Son's help at the new family home site. Son testified that he did not receive a salary, a higher allowance, or any gift from Father in return for Son's help at the new family home site. Both Father and Son also testified that Son could volunteer or had the option of going to the new family home site to help but that he was not required to work there. Son further testified that he did not have any specific directions from Father as to any work he should perform at the new family home site on the day of the accident. Son indicated he was going to help the insulation contractor with installing the spray foam insulation if needed and hoped to learn how to install spray foam insulation from the insulation contractor.

█ Moreover, even assuming *arguendo* that a master-servant relationship existed between Son and Father at the time of the accident, Father would not be liable because the "coming and going" rule would have applied.

█ "Under the doctrine of *respondeat superior*, an employer is held responsible for the misconduct of an employee where that employee is acting within the course and scope of his employment." *Tuttle v. Muenks*, 964 S.W.2d 514, 517 (Mo.App. W.D.1998). Under the doctrine of *respondeat superior*, the employer becomes liable despite the absence of any negligence on his part. *Tuttle*, 964 S.W.2d at 517. However, an employer is generally not liable under the doctrine of *respondeat superior* to an individual injured by an employee's negligent operation of a vehicle on his journey to and from work. *Logan v. Phillips*, 891 S.W.2d 542, 544 (Mo.App. E.D.1995). "Ordinarily, getting to the place of work is a personal problem of the employee and not a part of his services to his employer." *Logan*, 891 S.W.2d at 544. Absent some special benefit to the employer, other than the mere making of the services available at the place where they are needed, the employee is not acting within the scope of his employment while traveling to work. *Id.* "Inquiries to determine liability include whether the employer had any control or right of control over how, when or if the employee got to his place of employment." *Id.*

In this case, the evidence established that Son was driving himself to the family's new home site when the accident occurred. Son testified that he was "on his way to work" at the new family home when the accident occurred and was attempting to call Father to inquire about helping the insulation contractor with installing spray foam insulation that day. The record is devoid of any evidence indicating that Son was taking any tools, equipment, or supplies to the job site. Unlike the facts in several cases cited by Plaintiffs [2], the facts in this case *did not*

---

**2.** *See Foster v. Campbell*, 355 Mo. 349, 196 S.W.2d 147 (1946) (husband found liable for accident caused by wife acting as husband's agent in furtherance of husband's business because, at the time of the accident, wife was returning from an errand at husband's direction to fill a 55–gallon drum of gasoline for family farm); *Murphy v. Loeffler*, 327 Mo. 1244, 39 S.W.2d 550 (1931) (father found liable for son's negligent operation of father's vehicle while dropping off wedding guests then returning to pick up his parents at fa-

indicate that the trip itself was the work; rather, the trip was a means to reach a location.

Additionally, Plaintiffs' arguments regarding the dual purpose exception to the "coming and going" rule would have been irrelevant here. The dual purpose exception provides that an employee is deemed to be in the course of his employment although he may have been attending to a simultaneous personal purpose when the accident occurred. *Tuttle*, 964 S.W.2d at 518. Missouri courts have held the dual purpose doctrine applied in cases where an employee was traveling from his home to his job while carrying plans that he had worked on in his spare time, where an employee was traveling to get his paycheck and to pick up building materials to take to a job site, and where an employee was injured at the time he was taking some of his employer's lumber home overnight to deliver the next day. *Id., citing Cox v. Copeland Bros. Constr. Co.*, 589 S.W.2d 55, 60–61 (Mo.App. W.D. 1979); and *citing Corp v. Joplin Cement Co.*, 337 S.W.2d 252, 258 (Mo. banc 1960); *and citing Downs v. Durbin Corp.*, 416 S.W.2d 242, 247 (Mo.App.1967). Significantly, the dual purpose doctrine is not applicable unless the employee "in the course of his normal journey to and from work, performs some *concurrent service* for his employer." *Tuttle*, 964 S.W.2d at 519, *quoting Gingell v. Walters Contract-*

*ing Corp.*, 303 S.W.2d 683 (Mo.App.1957) (emphasis in original). In this case, even if Son could be considered an employee, there was no dual purpose for his trip to the family's new home site. He was merely driving to that location.

Consequently, under these circumstances, the trial court erred in finding Father vicariously liable for the negligence of Son. Point granted.

### Conclusion

With regard to Plaintiffs' appeal, we reverse and remand the portion of the judgment failing to award Mr. Meier non-economic damages for pain and suffering with instruction for judicial reassignment. With regard to Father's cross-appeal, we reverse the portion of the judgment finding Father liable for Mr. Meier's injuries because Father was not vicariously liable for Mr. Meier's injuries caused by Son. We affirm all other aspects of the trial court's judgment.

KATHIANNE KNAUP CRANE, Presiding Judge and LISA S. VAN AMBURG, Judge, concur.

---

ther's direction); *Bach v. Winfield–Foley Fire Protection Dist.*, 257 S.W.3d 605 (Mo. banc 2008) (aunt, who was present in vehicle she owned and had authorized nephew to drive on her behalf, could not prevail against nephew for aunt's injuries resulting from automobile accident because aunt had right to control or direct nephew's movements); *D.*

*Stonger v. Riggs*, 85 S.W.3d 703 (Mo.App. W.D.2002) (parents found liable for son's actions resulting in injuries to another child while son was driving lawn tractor in violation of law and at direction of parents to location where mowing job was to be performed).