SCHMIDBAUER, Etc. et al. *v.* BALTIMORE AND PITTSBURGH MOTOR EXPRESS COMPANY

[No. 272, September Term, 1961.]

638

*Decided May 18, 1962.*

*Motion for rehearing filed June 16, 1962, denied July 6, 1962.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT, MARBURY and SYBERT, JJ.

*Bayard Z. Hochberg,* with whom were *Paul Berman, Sigmund Levin, George D. Solter, Theodore B. Berman* and *George Sempeles* on the brief, for the appellants.

*Herbert F. Murray,* with whom were *Clater W. Smith, Robert E. Powell* and *Smith, Somerville & Case* on the brief, for the appellee.

PRESCOTT, J., delivered the opinion of the Court.

This is an appeal by William T. Schmidbauer and his employer's workmen's compensation insurer, plaintiffs below, from a judgment entered in the Baltimore City Court in favor of the appellee, Baltimore and Pittsburgh Motor Express Co. (Company or appellee), one of the defendants below, after the court granted appellee's motion for a directed verdict in its favor.

The principal question involved is a claim by the appellants that the trial court erred in refusing to submit to the jury the issue of appellee's responsibility as a common carrier franchised and duly certificated by the Interstate Commerce Commission (I.C.C.) for the negligence of one Selle, an unfranchised owner-operator, whose motor tractor was allegedly under lease to appellee at the time of a motor vehicle collision, in which Schmidbauer was injured.

On May 16, 1956, at about 1:40 a. m., Schmidbauer, while in the course of his employment, was operating a taxicab east on Baltimore Street, approaching its intersection with Gay Street. He entered the intersection on a green light, and a motor tractor, being operated in a northerly direction on Gay Street by Selle, came through a red light and collided with the taxicab (there is no controversy concerning the fact that Selle was negligent). The tractor was registered in Selle's name, and bore Pennsylvania license plates. Selle was a resident of that State, and had an operator's license therefrom.

Selle first began to haul freight for the appellee in June, 1955, under what he, Selle, referred to several times as a written lease,[1] whereby he "leased" his tractors to appellee to pull its trailers. Selle was an unfranchised owner-operator, who held no certificate from the I.C.C. to operate motor vehicles or perform transportation services in interstate commerce. The appellee was a common carrier of freight, duly franchised and certificated by the I.C.C. to operate in Maryland, Ohio and Pennsylvania. In order to render efficient and

---

1. Appellee contends that no lease was ever executed between it and Selle as required by the I. C. C., other than a "Memorandum of Agreement," dated June 15, 1955, which relates only to damage to equipment. More will be said concerning this later.

economical service, appellee employed salaried drivers of its own, and, in addition, augmented its own equipment and personnel by acquiring the services and equipment of others, this practice being quite prevalent in the industry.

Selle testified that he owned no trailers but hauled appellee's trailers. His tractor bore appellee's decals issued by appellee, and owner-operators were instructed to "X-out" appellee's name after arrival at their destinations. He was paid once a week on the basis of the number of tons of freight hauled during the week, and the longer the trip the more per ton he received. Appellee had no ownership interest in Selle's tractor. He serviced and greased his own vehicle and paid for his repairs. Appellee paid Selle only for the tonnage he hauled, and for nothing else.

Selle stated that he entered into only the one written lease of his equipment during the entire period of his relationship with appellee, and he carried this lease with him all the time. He and appellee did not execute a trip lease for each trip made by Selle; rather, he leased his tractor to appellee at times when appellee would require it. The lease he signed was not for any specified period of time and it did not have to be renewed; rather it was good until Selle "left the company * * * they didn't have to be renewed." No period of 30 days was mentioned, and, during the time that Selle was under lease to appellee, he would have to make his tractor available to appellee at any time appellee wanted it. Selle testified that appellee would contact him when it had a load of freight, and he would be given a manifest covering the load from the point of departure to the point of destination. Appellee dispatched from its terminals at 5:30 every evening. When Selle did not have a further run scheduled he would go home with his tractors if he were in Pittsburgh, but in other places he would let them "set at the terminals."

James F. Erb, appellee's Director of Safety, stated that generally when his company used non-owned equipment, the owner-operators contacted appellee by phone. Appellee dispatched from its terminals every afternoon at 5:30. The owner-operators were given a waybill and a manifest at the terminal from which they departed, and these documents were turned

in at their destination. He said that appellee had no jurisdiction "over the drivers" after they had turned in their manifest.

August H. Plitt, former Baltimore terminal manager of appellee, testified that there was no Company rule known to him which precluded persons like Selle from using their vehicles between actual hauls, "they were more or less on their own. We had no jurisdiction over them; at least we didn't maintain any jurisdiction" over them.

From the time Selle first began to haul for appellee, he worked for it steadily, averaging four or five trips a week; he, alone, drove his tractors, and he worked for nobody else during this period. On his last haul prior to the collision he was dispatched by appellee out of Ohio or Pennsylvania on the evening of May 14, 1956, with a load of miscellaneous freight, and he arrived in Baltimore on May 15, at approximately 9:00 to 9:30 p. m. He was hauling for appellee, and proceeded to appellee's terminal where he dropped the trailer, and turned in his manifest and bills to appellee's office. At that time, he knew there would be no dispatch until the following evening, and that until then he would be unable to get another trip out of appellee's terminal. No receipts for the equipment were exchanged between Selle and appellee at that time, or at any time prior to the collision.

Since there was no one else at the terminal, Selle drove downtown in his tractor, alone, and went to a movie. From the movie, he went to get a sandwich and a couple of bottles of beer at a place where he used to go "once in awhile." He then started back to appellee's terminal where it maintained a bunk room that drivers were permitted to use for sleeping when in Baltimore.

While proceeding toward the bunk room, the collision occurred. At the time of the collision, the tractor had both the name of the appellee and its I.C.C. permit number displayed on its side, and Selle was carrying a copy of his "lease" with appellee in his cab. At 5:30 p. m., on the date of the accident, he picked up, at its terminal in Baltimore, a load of freight for the appellee and carried it to Pittsburgh.

There can be little doubt that even after the enactment of the Motor Carrier Act of 1935, many evils existed in the motor carrier industry. 51 M.C.C. 461; 52 M.C.C. 675; 64 M.C.C. 361; 68 M.C.C. 553. In 1950, after a nationwide investigation of this complex industry, Division 5 of the I.C.C. published a report and recommendations in 51 M.C.C. at page 461. Some of the evils in this area of commerce arose out of the practice of authorized carriers using vehicles that belonged to others. The use of these nonowned vehicles was made under a great variety of arrangements, ranging from loose, informal oral agreements, made over the telephone or on the spot, between a franchised carrier, or someone for him, and the owner of the vehicle (who might or might not intend to be its operator), in many instances for a single-haul or round-trip movement, to formal written instruments applying for definite periods of time. (The single-haul arrangement is generally referred to as a trip lease, or one-trip lease.) Because of the looseness and informality of the arrangements for the use of equipment, questions frequently arose as to liability for accidents resulting in injuries to the public, and as to what insurer was liable at a particular time, the insurer of the authorized carrier or the insurer of the owner, and when the liability of one ended and the other began.

In order to cure some of the complexities then existing in the industry and to protect the public more securely and more certainly, the I.C.C., effective as of September 1, 1953, fortified the Motor Carrier Act of 1935 (49 U.S.C.A. § 301 et seq.) with important Regulations governing motor carriers of interstate and foreign commerce. (Effective as of April 2, 1957, the short-term, or trip lease was abolished, but that was after the date of the collision here involved.[2])

The pertinent provisions of Title 49 C.F.R. *Transportation,* Part 207, at the time of the accident, read as follows:

"§ 207.1 *Applicability.* The rules and regulations in this part apply to the augmenting of equipment * * * in interstate or foreign commerce * * *."

---

2. In Gallagher's Estate v. Battle, 209 Md. 592, 609, 122 A. 2d 93, it is stated, apparently in error, that the effective date of this Regulation, now Section 207.4 (a) (3), was September 1, 1953.

"§ 207.4 *Augmenting equipment.* \* \* \* authorized carriers may perform authorized transportation in or with equipment which they do not own only under the following conditions:

(a) The contract, lease, or other arrangement for the use of such equipment:

(1) Shall be made between the authorized carrier and the owner of the equipment.

(2) Shall be in writing and signed by the parties thereto, \* \* \*.

\*   \*   \*   \*   \*

(4) Shall provide for the exclusive possession, control, and use of the equipment, and for the complete assumption of responsibility in respect thereto, by the authorized carrier, as follows:

(1) For the duration of said contract, lease or other arrangement, \* \* \*.

\*   \*   \*   \*   \*

(6) Shall specify the time and date or the circumstances on which the contract, lease, or other arrangement begins, and the time or the circumstances on which it ends. The duration of the contract, lease or other arrangement shall coincide with the time for the giving of receipts for the equipment, as required by paragraph (b) of this section; and

\*   \*   \*   \*   \*

(b) *Receipts.* When possession of the equipment is taken by the authorized carrier or its regular employee or agent authorized to act for it, said carrier, employee or agent shall give to the owner of the equipment, or the owner's employee or agent a receipt specifically identifying the equipment and stating the date and the time of day possession thereof is taken; and when the possession by the authorized carrier ends, it or its employee or agent shall obtain from the owner of the equipment, or its regular employee or agent duly authorized to act for it, a receipt specif-

ically identifying the equipment and stating therein the date and the time of day possession thereof is taken.

\* \* \* \* \*

(d) *Identification of equipment*. The authorized carrier acquiring the use of equipment under this section shall properly and correctly identify such equipment as operated by it *when such equipment is operated by or for such carrier, during the period of the lease,* contract, or other arrangement, in accordance with the Commission's requirements in Ex Parte No. MC-41; Part 166, Identification of Motor-Carrier Vehicles. \* \* \*.

(1) The authorized carrier operating equipment under the rules in this part shall remove any legend, showing it as the operating carrier, displayed on such equipment, and shall remove any removable device showing it as the operating carrier, before relinquishing possession of the equipment." (Emphasis ours.)

The appellants were unable to prove (and the appellee did not produce) any written agreement between the carrier and the owner-operator, other than the "Memorandum of Agreement" referred to above, which dealt only with the question of liability, as between the parties to the agreement, for damages to their respective equipment. Appellee contends this was the only written agreement between it and Selle, and concedes that no receipts were exchanged by it and Selle as anticipated by § 207.4 (b) and that it did not require him to remove its legend as called for by § 207.4 (d) (1) (Erb testified these regulations were just not enforced at the time, and the Company did not comply with them) ; but appellee claims its arrangement with Selle was for a one-trip hauling, which was legal at the time of the collision, and its responsibility for his tractor ceased when he delivered its trailer to the terminal and turned in the manifest. Appellants counter by contending, *inter alia,* that Selle had been hauling, exclusively, for the appellee nearly a year; that it only had one written contract with him; that he had hauled, under it, on the average

of four or five trips a week for the appellee; that the provisions of the above quoted Regulations were, by law, made a part of any agreement or arrangement between appellee and Selle; that the evidence permitted a rational inference that Selle, at the time of the accident, was awaiting a return haul for the appellee; and, as a consequence of the above, a jury question was presented as to whether or not Selle was hauling for the appellee under a long-term arrangement, or a one-trip lease. The appellants further contend that, if the Court disagrees with the aforesaid claim, the evidence, conclusively, shows that Selle was operating under a one-trip lease, with the Regulations made a part thereof by law, and this lease had not been terminated at the time of the collision, due to appellee's failure to comply with § 207.4 (b) and (d) (1). It will not be necessary to elaborate upon these contentions. For the purposes of our decision, we shall assume without deciding, that Selle was hauling for the appellee under a long-term arrangement, with the said Regulations engrafted therein by law, which places the appellants in the best position they can occupy under the contention now under consideration.

The undisputed evidence in this case shows that Selle was an independent contractor,[3] for whose negligence the appellee, under well-recognized principles of negligence law, was not responsible, unless that responsibility was created by the above quoted Regulations (more will be said concerning this later).

However, the appellants argue that the provisions in the Regulations requiring the franchised carrier to assume exclusive possession, control and use of any nonowned equipment, and the assumption of responsibility in respect thereto for the duration of the contract, lease or other arrangement for the use of said equipment, were intended "to *insure* (italics ours) that the public will be secured and protected from the negligent or reckless conduct of those who participate in, or who affect, commerce."[4] In other words, they claim the Regulations impose vicarious liability upon a certificated carrier for the negligent operation of nonowned equipment for the duration of

---

3. Marine v. Service Trucking Co., 225 Md. 315, 170 A. 2d 188.
4. Appellants do not claim that § 207.4 (4) and (4) (1) require a carrier to indemnify an owner-operator against his own negligence.

the carrier's lease under almost any and all circumstances, regardless of whether the equipment is being operated in furtherance of the carrier's business or in an activity that has any relationship to interstate or foreign commerce. We are unable to agree.

It is unquestionably true that the Regulations were designed to prevent a franchised carrier of interstate or foreign commerce from denying responsibility for the negligent operation of its nonowned equipment by simply employing an independent contractor to do the hauling.[5] And, if the failure of the carrier to require a removal of its legend before relinquishing possession of equipment and/or its failure to obtain a receipt stating the time and date of such relinquishment authorize an activity of the equipment (even though such activity be of a nature not originally anticipated by the carrier and owner-operator in their agreement) in interstate or foreign commerce, or an activity that bears a direct relationship to such commerce, then the carrier is responsible for the negligent operation of the equipment. *Mellon National Bank & Trust Co. v. Sophie Lines, Inc.,* 289 F. 2d 473 (C. A. 3rd). But it is firmly established that the power of Congress to control intrastate transactions on the ground that they affect interstate commerce is confined to transactions which directly affect interstate commerce. Where there is merely a remote connection, or no connection, the power to regulate remains in the State. *Schechter Corp. v. United States,* 295 U. S. 495, 544; *National Labor Relations Board v. Jones & Laughlin Steel Corp.,* 301 U. S. 1, 37; *United States v. Darby,* 312 U. S. 100, 119; *United States v. Wrightwood Dairy Co.,* 315 U. S. 110, 119. And it will be noted that § 207.1 specifically states: *"Applicability.* The rules and regulations in this part apply to the augmenting of equipment * * * *in interstate or foreign commerce* (italics ours) * * *."* From the above, it seems clear to us that the I.C.C. only intended Part 207 of its Regulations to apply to interstate and foreign commerce. We, therefore, hold that § 207.4 does not impose liability

---

**5.** Leotta v. Plessinger, 171 N. E. 2d 454 (N. Y.); Costello v. Smith, 179 F. 2d 715. Cf. Gallagher's Estate v. Battle, footnote (2) above.

on the franchised carrier between interstate movements, when the nonowned equipment is being utilized in an activity that is entirely disassociated with interstate or foreign commerce, such as the activity of the tractor involved in the present case, as shown by the undisputed facts. The fact that appellee's name and I.C.C. permit number were displayed on the tractor and the fact that a copy of the lease was in the cab are immaterial in the case at bar. None of these was needed (in fact the name and permit number should not have been on the tractor) to carry on the movement in which the operator was engaged when the collision occurred. His Pennsylvania operator's permit authorized his driving the tractor. Cf. *Simon v. McCullough Transfer Co., Inc.,* 98 N. E. 2d 19 (Ohio); *Gallagher's Estate v. Battle, supra.*

A close analogy exists between the status of the operator of the equipment in the instant case and the statuses of employees in cases dealing with whether railroad employees are engaged in interstate commerce, so as to bring them within the Federal Employers' Liability Act. In *Pryor v. Bishop,* 234 F. 9 (C. A. 7), a member of a train crew was killed while resting in a caboose which was being transferred from one railroad yard to another after being removed from a train which had completed an interstate trip. The deceased's general employment was in interstate commerce, and the caboose was to be part of a train making an interstate run from Chicago, Illinois, to Montpelier, Ohio. The deceased and other members of the crew boarded the caboose to rest while it was detached. Under the terms of his employment, the deceased was subject to call at any time after the expiration of an eight hour rest period to which he was entitled on completion of a trip. After the deceased had boarded the caboose, it was being hauled to another yard, where the train, eventually, was to be made up, when the deceased was killed. On these facts the Court held that the deceased was not employed in interstate commerce at the time of the accident, stating, 234 F. at 14-15:

> "In the instant case, however, there was no such duty [to be in the caboose]; the deceased could as well have been at a city hotel; his only duty at the time was to be within call, either personal or tele-

phonic. That he was on the company's property at the time of the injury was due, not to an obligation, but to a privilege, a license; in being there, he was acting, not as an employee, but as a licensee.

"If, however, he could be deemed to be in the employment of the company at the time of the injury, nevertheless he was not then actually employed in interstate commerce. His actual employment at the time was holding himself ready in the city of Chicago to respond to a call for service. *That the call, when it came, would be for an interstate trip, does not make the waiting in Chicago an actual engagement in interstate commerce, within the terms of the federal act.*" [6] (Emphasis ours.)

Similarly in the case at bar, the fact that Selle might later obtain another haul from appellee and that he was on his way to appellee's bunk-room to sleep pending appellee's dispatch time the following evening does not make his waiting in Baltimore an engagement in interstate commerce.

The appellants have cited four cases, which they claim support their contention that the instant case should have been submitted to the jury: *Leotta v. Plessinger, supra,* 171 N. E. 2d 454 (N. Y.) ; *Mellon National Bank & Trust Co. v. Sophie Lines, Inc., supra; Duke v. Thomas,* 343 S. W. 2d 656 (St.

6. For other illustrative F.E.L.A. cases see Hines v. Baechtel, 137 Md. 513, 113 A. 126, cert. den. 256 U. S. 698, (employee of railroad company, injured while carrying to the telegraph office a message relating to the company's supply of coal at a particular point, held not to be engaged in work sufficiently connected with interstate trains to exclude claim under State law); Erie R. Co. v. Welsh, 242 U. S. 303, 37 S. Ct. 116, 61 L. Ed. 319 (1916) (yard conductor, injured while alighting from a locomotive to report for orders, held not engaged in interstate commerce); Young v. New York, N. H. & H. R. Co. (C. A. 2, 1934), 74 F. 2d 251 (locomotive fireman held not engaged in interstate commerce when, after completing his day's work on a locomotive, he was riding another locomotive to a place where he had left a change of clothes); Boyer v. Pennsylvania R. Co., 162 Md. 328, 159 A. 909 (plaintiff railroad employee injured while riding to work in an automobile driven by co-employee, held not to be employed in interstate transportation).

Louis Ct. App.) and *Virgil v. Riss & Co.,* 241 S. W. 2d 96 (Kan. City Ct. App.). We shall not discuss them in great detail; to do so would make a long opinion much longer. We think they are all distinguishable from the case at bar.

In *Leotta,* the Court was divided. Two judges dissented, and Chief Judge Desmond wrote a concurring opinion. A careful reading of his opinion discloses that he thought the argument presented here by the appellants—that § 207.4 creates responsibility in the franchised carrier for the negligent operation of nonowned equipment for the duration of its leasing, almost regardless of the surrounding circumstances—should prevail, but the majority were unwilling to so hold. The majority, obviously, realized that the plaintiffs' evidence was thin, but felt that the evidence, and inferences that could be drawn therefrom, made out a *prima facie* case on the question of whether the operator of the nonowned equipment was operating within the scope of his employment by the carrier. The specific question of the relationship between the lessee-carrier and the operator of nonowned equipment when such equipment is engaged in an activity that bears no relation to interstate commerce was not discussed in the opinions. However, the opinions seem to have assumed that if the jury found that the operator of the nonowned equipment was operating within the scope of his employment at the time of the accident, he was engaged in a movement that bore a direct relationship to interstate commerce, as he was proceeding toward a terminal during office hours, where he anticipated picking up, and did finally pick up, a return haul in interstate commerce. In the other three cases there was a clear relationship between the activities of the drivers and interstate commerce; they were either operating their vehicles in interstate commerce, or performing acts which arose of necessity from an interstate movement.

This brings us to a consideration of the relationship between Selle and the appellee when Selle's tractor ceased being engaged in interstate commerce. We have stated above that Selle was an independent contractor (a fact which seems to be conceded by the appellants), who furnished augmenting equipment to the appellee, a franchised carrier. As long as such equipment was used in an activity that bore a direct rela-

tionship to interstate commerce, the provisions of § 207.4 of the Regulations required the carrier to assume responsibility, to the public and to the shipper, for the operation of the equipment.[7] The Supreme Court of Ohio stated that I.C.C. Rule No. 4, the precursor of § 207.4 (4) and (4) (1) made the driver of an independent contractor furnishing equipment to an authorized shipper the employee or servant of the shipper "so far as the public is concerned." *Thornberry v. Oyler Bros., Inc.,* 131 N. E. 2d 383. But, when the equipment in the instant case was no longer engaged in interstate commerce, and therefore, the provisions of § 207.4 no longer operative, the ordinary relationship of lessee and independent contractor necessarily followed. And this was the relationship between appellee and Selle at the time of the accident, as established by plaintiffs' evidence.

It is well-established law that when the ordinary relationship of principal and independent contractor exists, as distinguished from that of master and servant, or principal and agent, the principal is not liable (with exceptions not here pertinent) for the negligence of the independent contractor.[8] *Greer Lines Co. v. Roberts,* 216 Md. 69, 78, 139 A. 2d 235; *Hoerr v. Hanline,* 219 Md. 413, 149 A. 2d 378; 2 *Mechem, Agency* (2nd ed.), § 1858. Consequently, the trial court was correct in granting appellee's motion for a directed verdict.

The above makes it unnecessary for us to determine the question, raised by appellants, of the admissibility, *vel non,* of certain evidence.

*Judgment affirmed, with costs.*

---

7. This, of course, is a departure from the modern concept of the doctrine of respondeat superior. For a history of the doctrine, see Henkelmann v. Met. Life Ins. Co., 180 Md. 591, 26 A. 2d 418.

8. In cases of this nature, the question of what relationship actually existed between the alleged negligent operator and his superior, i.e., master and servant, principal and agent, or principal and independent contractor, is, generally, one of fact for the jury, Fowser Fast Freight v. Simmont, 196 Md. 584, 78 A. 2d 178; but where, as in the instant case, the facts are uncontradicted and conclusive, the question of such relationship is one of law. Phipps v. Milligan, 174 Md. 438, 199 A. 498, Hoerr v. Hanline, supra. Grier v. Rosenberg, 213 Md. 248, 131 A. 2d 737.