Dennis BRANNAKER, Respondent,

v.

TRANSAMERICAN FREIGHT LINES, INC., a Corporation, Riggs Dairy Express Company, Sykes Transport Company, a Corporation, and Donald Murray, Appellants.

No. 52351.

Supreme Court of Missouri, Division No. 1.

May 13, 1968.

Motions for Rehearing or for Transfer to Court En Banc Denied June 10, 1968.

James E. Hullverson, Hullverson, Richardson & Hullverson, St. Louis, for respondent.

Alphonso H. Voorhees, Harold A. Thomas, Jr., Frank E. Vigus, Fordyce, Mayne, Hartman, Renard & Stribling, St. Louis, for appellant, Transamerican Freight Lines, Inc.

John M. Goodwin, Henry S. Stolar, Justin C. Cordonnier, Hocker, Goodwin & MacGreevy, St. Louis, for appellant Riggs Dairy Express Co.

F. X. Cleary, Paul S. Brown, Daniel T. Rabbitt, Moser, Marsalek, Carpenter, Cleary & Jaeckel, St. Louis, for appellant Sykes Transport Co.

Luke, Cunliff, Wilson, Herr, Chavaux & McCluggage and Paul H. Chavaux, St. Louis, for appellant Donald Murray.

STORCKMAN, Judge.

This is a suit for personal injuries. A tractor-trailer unit operated by defendant Donald Murray crashed into the rear of a standing police patrol car knocking it forward into the rear of plaintiff's automobile which was also stopped. The plaintiff was trapped between the front of the police car and the rear of his own automobile and seriously injured. Donald Murray owned the truck-tractor which was pulling a trailer belonging to his brother Lawrence. A verdict was directed in favor of Lawrence Murray and he is no longer in the case. Transamerican Freight Lines, Inc., Riggs Dairy Express Company, and Sykes Transport Company were sued as lessees or principals of the defendant Donald Murray. The jury found for plaintiff and against the three corporate defendants and Donald Murray in the sum of $185,000. A remittitur of $40,000 ordered by the trial court was accepted by the plaintiff and judgment was rendered for $145,000. The corporate defendants and Donald Murray have appealed.

The three corporate defendants, herein referred to as Transamerican, Riggs, and Sykes, contend that their separate motions for directed verdicts should have been sustained. Transamerican also complains of the exclusion of certain evidence. All four appellants assert that the trial court erred in failing to give Missouri Approved Instruction 2.02, that other instructions are erroneous, and that the verdict is still excessive after remittitur.

The defendant Donald Murray, aged 30, a resident of Flat River, Missouri, was a truck driver by occupation. In January 1963 he purchased a 1957 diesel tractor from Mack Truck Company. On February 4, 1963, Murray by an agreement in writing leased his tractor to Sykes for a period of two years. Pursuant to the lease Murray drove his leased tractor and pulled a trailer supplied by Sykes. In July 1963 Murray and Sykes had a disagreement as a result of which Murray did no further hauling on direct orders from Sykes. After some ne-gotiations Murray returned to Sykes the trailer in his possession, but he did not give up the Missouri license plates obtained by Sykes but paid for by Murray. Furthermore, the name of the Sykes Company remained on the tractor together with the numbers of the Missouri Public Service Commission and Interstate Commerce Commission certificates and permits. Thereafter, Murray used a refrigerated trailer belonging to his brother. This, in general, was the situation at the time of the accident on November 9, 1963.

On November 2, 1963, pursuant to a telephone call, Murray drove the tractor-trailer unit to Marshall, Missouri, where he entered into a lease with Riggs to haul a cargo of frozen TV dinners and similar commodities from Marshall to Springfield, Massachusetts. After delivering the cargo in Springfield, Murray communicated with Transamerican and solicited a cargo for his return trip. He entered into a lease with Transamerican to haul a cargo from New Britain, Connecticut, to South Bend, Indiana. After he delivered this cargo, Murray left South Bend at midnight on November 7 and reached St. Louis about 3 p.m. the following day. He intended to stay there for the night and have the Mack Company do some work on his tractor. After spending some time at the Mack Truck terminal at Chouteau and Jefferson, he drove to the 1800 block of North Ninth Street where friends of his operated a service station. He went with friends to a restaurant where he ate food and drank some beer. He then went back to the service station where he talked for awhile and slept in his tractor for about two or three hours. On awakening he decided not to stay in St. Louis to have his tractor worked on and started driving south on Broadway toward his home in Flat River.

The plaintiff Dennis Brannaker, a single man aged 24 at the time of the trial in March 1966, had suffered a broken right leg while riding a motor scooter in June 1963 shortly before he was to start working for McDonnell Aircraft Company. While convalescing he did odd jobs and light work for "gasoline

and cigarette money". About 1:30 a.m. on November 9, having finished doing some clean-up work in a cafeteria at Gravois and Morganford, Brannaker drove with a friend to a service station in the 7400 block of South Broadway. As the plaintiff started to drive out of the service station, a police officer directed him to pull his automobile over to the west curb of South Broadway. The police patrol car pulled up and stopped in the curb lane four to seven feet behind plaintiff's car. At the officer's request the plaintiff and his friend went back to the patrol car where they were interrogated by the police officer and after giving satisfactory identification were told they would not be detained further. In the process of returning to their automobile, the plaintiff and his friend were passing between the two cars when the tractor-trailer unit driven by defendant Murray struck the patrol car violently in the rear knocking it forward against the rear of the plaintiff's car. The plaintiff was wedged between the two automobiles and his legs were crushed. None of the appellants question the sufficiency of the proof of defendant Murray's negligence or its being the proximate cause of plaintiff's injuries. Further relevant evidence will be discussed in connection with the issues presented.

Matters of historical significance in the development of federal laws and regulations relating to commercial transportation by motor carriers are quite fully described and additional source materials indicated in Duke v. Thomas, Mo.App., 343 S.W.2d 656 at pages 658–659, and Schmidbauer v. Baltimore & Pittsburgh Motor Express Company, 228 Md. 637, 181 A.2d 325 at pages 327–328. Insofar as we are immediately concerned, one of the principal abuses that developed after the enactment of the first Motor Carrier Act in 1935 and the Missouri Act which became Chapter 390, RSMo 1959, V.A.M.S., was the practice whereby authorized motor carriers leased equipment from others and engaged the owners or someone for them to drive and operate the equipment as independent contractors to transport cargo for the authorized carriers. The leases were usually for a single trip or for short duration and the independent contractors were often unreliable. This practice created economic abuses and legal problems which brought on legislation and regulations designed to prevent the authorized motor carriers from delegating the performance of their franchise duties to independent contractors and from engaging in ruinous competition and evading their public responsibilities. Among the requirements imposed to lessen such abuses were the provisions that no lease of equipment from an owner should be for a term of less than 30 days and that the authorized carrier would retain control of the equipment and be responsible for its operation when the owner or his employee was the driver of the vehicle.

The present Motor Carrier Act governing the use of motor vehicles not owned by authorized carriers, 49 U.S.C.A. § 304(e) (1), authorizes the Interstate Commerce Commission to prescribe regulations requiring that any lease contract or other arrangement with respect to the use by authorized carriers of motor vehicles not owned by them "shall specify the period during which it is to be in effect, and shall specify the compensation to be paid by the motor carrier, and requiring that during the entire period of any such lease, contract, or other arrangement a copy thereof shall be carried in each motor vehicle covered thereby". Subsection (e) (2) of § 304 further provides that the Commission may promulgate "such other regulations as may be reasonably necessary in order to assure that *while motor vehicles are being so used the motor carriers will have full discretion and control of such vehicles and will be fully responsible for the operation thereof in accordance with applicable law and regulations, as if they were the owners of such vehicles,* including the requirements prescribed by or under the provisions of this chapter with respect to safety of operation and equipment and inspection thereof, which requirements may include but shall not be limited to promulgation of regulations requiring liability and cargo insur-

ance covering all such equipment." Italics added.

Consistent with the federal statutes, the Interstate Commerce Commission adopted regulations, 49 CFR 207.4, providing that authorized carriers may perform authorized transportation in or with equipment which they do not own under these, among other, conditions: the lease must be in writing and be made between the authorized carrier and the owner of the equipment and signed by the parties or by their duly authorized agents; the lease must specify the period for which it applies and when the equipment is to be operated for the authorized carrier by the owner or his employee the duration of the lease shall not be less than 30 days; and the lease shall "provide for the exclusive possession, control, and use of the equipment, and for the complete assumption of responsibility in respect thereto, by the lessee for the duration of said contract, lease or other arrangement". Section 207.4 further provides how copies of the lease shall be distributed and that one shall be carried on the vehicle during the entire period of the lease; that receipts identifying the equipment shall be given when the authorized carrier takes possession from the owner and when the possession is returned to the owner by the authorized carrier; that safety inspections shall be made before the carrier takes possession; that the authorized carrier shall identify each vehicle operated under its own power, either alone or in combination, by displaying on both sides thereof devices bearing the number or numbers of the authorized carrier as the operating carrier which identification shall be removed when the lease is terminated; that the driver of the equipment shall be in compliance with safety regulations; and that an authorized carrier utilizing equipment operated for periods of less than 30 days shall prepare and keep a manifest and other documents covering each trip for which the equipment is used in its service and certain other information relating to the owner of the equipment, its prior use, and the authorized carrier's identification devices.

Certain exceptions to the parts of the regulations noted will be referred to later.

All three of the leases involved in this case provide for control of the equipment and the driver by the lessee for the duration of the lease. This is mandatory under § 207.4(a) (4) which requires the lease to provide for "the exclusive possession, control, and use of the equipment, and for the complete assumption of responsibility in respect thereto, by the lessee".

The regulation does not impose liability on a motor carrier using leased equipment for the negligence of an owner-driver of such equipment greater than the carrier's liability for the negligence of its driver when operating its own equipment. Wilcox v. Transamerican Freight Lines, Inc. (6 Cir.) 371 F.2d 403, 404[1]; Gackstetter v. Dart Transit Company, 269 Minn. 146, 130 N.W.2d 326, 328[2]. That no more is intended is apparent from the applicable federal statute which requires assurance that while motor vehicles are being so used the carriers will have full discretion and control and "will be fully responsible for the operation thereof in accordance with applicable law and regulations, *as if they were the owners of such vehicles*". Emphasis added. 49 U.S.C.A. § 304(e) (2). The legislative intention was to put the use and operation of leased vehicles on a parity with equipment owned by the authorized carrier and operated by its own employees.

49 CFR 207.4(a) (4) (i) authorizes the inclusion of a provision in the lease "for considering the lessee as the owner for the purpose of subleasing under these rules to other authorized carriers during such duration" of the lease. Paragraph 2 of the Sykes lease provided that the lessee could use the equipment in connection with lease arrangements it might conclude with other carriers. While Murray was both the owner and operator of his tractor, he could not operate in interstate commerce in his own right because he did not hold a certificate or permit issued by the Interstate Commerce Commission. 49 U.S.C.A. § 303(c). In

order for him to participate, it was necessary for him to enter into a lease arrangement with a certificated motor carrier. The Sykes lease of Murray's tractor was for a period of two years from the date of its execution on February 4, 1963, subject to cancellation "by either party by written notice of cancellation sent by United States mail" to the other party. Such cancellation would not be effective, however, until 30 days from the date the notice was mailed. There was a further provision that by mutual consent the parties could cancel the lease at any time. Sykes claims to have mailed a letter of cancellation to Murray at the time their disagreement arose in July 1963; however, Sykes could not produce a copy of the letter because the Company office had been moved in the meantime and the Murray file could not be located. Murray denied that he received any such letter. He did admit that he received a letter from Sykes, a copy of which was introduced in evidence as Sykes's Exhibit A. The letter was dated August 5, 1963, and stated in substance that Sykes was withholding payment for one load and that it would pay Murray in full if he would bring the license plates to the Ironton office. Murray took the licenses to the office but no agreement was reached and he left taking the licenses with him after Mr. Sykes had told him not to use them because he might make the Sykes Company liable.

There is also evidence that Sykes alerted some of its agents to try to obtain the licenses from Murray but they were unable to do so. Sykes did not notify the Public Service Commission or any other regulatory agency that the Murray lease had been cancelled as it had done in other instances. It did not actively pursue Murray or take other measures to get possession of the licenses and to have its name and numbers removed from the tractor or to secure the lease required to be carried in the tractor and to obtain a receipt from Murray for the equipment which is ordinarily required by the Interstate Commerce Commission at a termination of a lease.

In this situation Murray was enabled to make numerous hauling agreements and collect a considerable amount of transportation charges from July to the time of the accident although he received no hauling assignments from Sykes during that time. There was evidence, however, that Murray made numerous contracts for hauling without prior consultation with Sykes both before and after the July disagreement. Mr. Sykes testified that subleasing between the carriers was done every day and that the Company drivers were encouraged to solicit freight hauls in Sykes' name. Sykes received no portion of the revenue earned by Murray after July. Murray testified he kept all of it because Sykes owed him money. Considering the evidence in the light most favorable to the verdict, we cannot say as a matter of law that the Sykes lease was cancelled in the manner provided in the contract or that it had become a nullity by reason of mutual consent or abandonment.

The lease executed by Riggs Dairy Express, Inc., on November 2, 1963, purported to be made with the Sykes Transport Company as lessor. It was signed for Sykes by Don Murray and called for the transporting of a cargo from Marshall, Missouri, to Springfield, Massachusetts, with an intermediate delivery in Waterford, New York, for a total charge of $452.10. The lease provided that it would be in effect from the commencement of the loading of the motor vehicle to the termination of the unloading; that the equipment would be used by the lessee in the operation of its business as an interstate motor carrier and at all times during the term of the lease would be "under the sole direction and control of lessee" which was Riggs. It provided that the lessor would furnish the driver and pay all expenses of the operation of the vehicle and that the operator should keep logs in the form and manner required by the Interstate Commerce Commission. The cargo consisting of frozen TV dinners was carried in the refrigerated trailer and delivered by Murray to the consignees in New York and Massachusetts. After the last of

the cargo was taken from the trailer in Springfield, Massachusetts, the placards containing Riggs's name and identifying numbers were removed from the equipment. The check for final payment in the amount of $235.55 was made payable to the order of Sykes Transportation Company. It was endorsed and cashed by Murray and the proceeds were retained by him.

The defendant Murray then went to New Britain, Connecticut, where he entered into a lease agreement with Transamerican. Transamerican Exhibits C through G, which are carbon copies of Murray's driver's daily logs of October 30–31, November 1, 2, 3 and 4, 1963, were received by Transamerican on November 5. The first two of the logs (at which time Murray was "off duty" in St. Louis) give the name of Sykes Transport Co., Ironton, Mo., as the carrier. The last three list Riggs Food Express, New Bremen, Ohio, as the carrier. All of the logs are in Murray's handwriting, show him as the driver and his home terminal as St. Louis, Missouri. The Sykes name does not appear on the Transamerican lease. Murray, as owner of the motor vehicle equipment, signed a statement that the equipment was based in Flat River, Missouri, and that it had "completed a movement (carrying livestock, fish or agricultural commodities) covered by Section 203(b) (6) of said Act and may next be used in a loaded movement in any direction, and/or in one or more of a series of movements in the general direction of the general area of its base, as provided in Section 204(f) (2) of said Act." The statement further recited that the last movement of the equipment originated in Marshall, Missouri, and its destination was Springfield, Massachusetts. The document was designated "LEASE AGREEMENT WITH HAULERS OF EXEMPT COMMODITIES". The rental was a flat rate of $275 for the trip from New Britain to South Bend, Indiana. The agreement provided that at its termination Murray should forthwith remove from the motor vehicle equipment "all plates, signs or other evidence of certificate numbers or permits"

belonging to Transamerican and return them. This was done. Also at South Bend, Indiana, Murray signed a receipt at the bottom of the lease agreement whereby he acknowledged the return of the equipment to him on November 7, 1963. His driver's log of November 7 at 2 p.m. has this statement in Murray's handwriting: "South Bend Ind End Lease".

Riggs claimed it was exempt from the 30-day-lease term by reason of the provisions of § 207.3 of 49 CFR which provided that the provisions of § 207.4 except paragraphs (c) and (d) relative to inspection and identification of equipment shall not apply to equipment owned or held under a lease of 30 days or more by an authorized carrier and regularly used by it in the service authorized when such equipment is leased by it to another authorized carrier for transportation in the direction of a point which the lessor is authorized to serve. Riggs claims that its agreement and performance brought it within all of the provisions of § 207.3. Transamerican claimed it came within the exception contained in § 207.4(a) (i) in that it was entitled to rely upon Murray's certificate that the trip just completed was exempt and rendered the equipment eligible for transporting the South Bend shipment. If Riggs and Transamerican were entitled to rely on the representations made to them, they were authorized to enter into leases for terms of less than 30 days.

■ As a general rule the revocation of the authority of an agent takes effect as to third persons only from the time the revocation is made known to them. Lamothe v. St. Louis Marine Railway and Dock Co., 17 Mo. 204, 209; Waters-Pierce Oil Co. v. Jackson Junior Zinc Co., 98 Mo.App. 924, 73 S.W. 272, 273[3]. A more comprehensive treatment on the necessity of notice to third persons is found in 3 Am.Jur.2d Agency § 44 as follows:

"So far as third persons are concerned, the principal, as a rule, may revoke the authority of his agent at any time, but the acts of an agent after his authority has been

revoked may bind a principal as against third persons who, in the absence of notice of the revocation of the agent's authority, rely upon its continued existence. The general rule is that the acts of an agent, within the apparent scope of his authority, are binding on the principal as against one who had formerly dealt with him through the agent and who had no notice of the revocation, because such a person is justified in assuming the continuance of the agency relationship. This is especially so with reference to transactions initiated by the agent before the revocation of his authority, as in the case of persons continuing to deal with purchasing agents or insurance agents. Moreover, the principal may, by reason of his conduct subsequent to the revocation of an agent's authority, be estopped to deny that revocation.*

"The rule requiring notice of the revocation of an agency to be given to third persons is not limited in its operation to persons who have dealt with the agent before the attempted revocation. In the absence of any notice of the revocation of an agency, the principal may be held liable to third persons who never dealt with the agent previous to the revocation, if they, in common with the public at large, are justified in believing that such agency continues to exist. This is especially so where, after the revocation, the agent is permitted to deal with the principal's goods in his own name and in a manner indicating that he is the owner."

■ In view of Sykes' failure and neglect to erase its name and numbers from Murray's tractor, to secure the return of its license plates, and to notify the regulatory agencies and other of the cancellation of the lease, Riggs and Transamerican were justified in dealing with Murray as if the lease with Sykes was still in effect.

■ The plaintiff contends the Riggs lease was not exempt from the requirement that leases of non-owned equipment operated by the owner or his employee must be

for a period of not less than 30 days. He asserts that to come within the exemption of 49 CFR 207.3(a) the equipment must be "regularly used" by the lessee in the authorized service, that "equipment" includes trailers, § 207.2(b), and that Murray was pulling his brother's trailer which had not been regularly used in the service of Sykes. This may be an infraction of Interstate Commerce regulations for which the offender could be punished, but is not sufficient to invalidate a lease agreement. If the parties to lease arrangements were required to check the title of each piece of equipment and the extent to which it has been used, the operations of the motor carrier industry would be retarded unnecessarily, and questions might arise which only a lawsuit could resolve. The prime subjects of the Riggs sublease were the tractor bearing Sykes' name and numbers and Murray its driver, both of which were the subject matter of the Sykes lease. In these circumstances Riggs was justified in relying on the representations made and the sublease was in substantial compliance with § 207.3(a).

The plaintiff further contends that the Transamerican lease was not exempt from the provisions of 49 CFR 207.4 for 30-day leases because the prior haul by Riggs was not exempt. This contention is based on the premise that the frozen TV dinners shipped by Riggs were not agricultural commodities or perishable property within the meaning of 49 U.S.C.A. § 303(b) (6) and 49 CFR 207.4(a) (3) (i). There is no evidence that Transamerican saw the manifest of the Riggs cargo or had any knowledge of its contents other than the signed statement of Murray specifying that the movement completed was exempt under the provisions for carrying livestock, fish or agricultural commodities. Again Murray may be penalized for making a false certificate, but we find no authority for invalidating the lease on that ground. Our examination of the Transamerican lease does not disclose any infirmity that would deprive it of the exemption provided by the federal statute and regulations.

* Apparently the meaning intended by the last phrase of this sentence is that the principal may be estopped to deny that *the agency continued to exist.*

The plaintiff further contends that even though Murray's certificate would protect Transamerican from prosecution, it would not relieve the carrier of its common-law responsibility to the plaintiff. This touches on the contention also made that all three of the corporate defendants are jointly and severally liable. It raises the question whether transportation contracts, and especially the provisions for exclusive control by the lessee, can all be in effect and active at the same time.

■ The essential element in determining whether the driver of a motor vehicle is the agent or servant of the owner at the time of the wrongful act is the owner's right to control and direct the driver's conduct. McFarland v. Dixie Machinery & Equipment Co., 348 Mo. 341, 153 S.W.2d 67, 70[3], 136 A.L.R. 516. A man cannot serve two masters at the same time, and although there may be a joint employment and also acts for which more than one employer may be liable, nevertheless there is no several liability of two persons, not acting jointly, as separate masters of a single servant for the same act. McFarland v. Dixie Machinery & Equipment Co., 348 Mo. 341, 153 S.W.2d 67, 69–70[1], 136 A.L.R. 516; O'Brien v. Rindskopf, 334 Mo. 1233, 70 S.W.2d 1085, 1088[3]; Vance Trucking Co. v. Canal Insurance Co., D.C., 249 F.Supp. 33, 37[3]; 57 C.J.S. Master and Servant § 566 c, p. 291. We find nothing in the federal statutes or regulations which discloses an intention to apply a different rule in motor carrier cases. On the contrary they provide that the lessee shall have "full" and "complete" control and responsibility during the term of its lease. The leases in question so provided. The Vance Trucking case recognizes the rule as stated above but on the facts decides that the driver of the leased tractor was under the joint control of Vance the lessee and Forrester the lessor. Both the facts and the lease arrangement are so different that the case is not persuasive of the disposition of the Riggs and Transamerican cases.

■ Plaintiff also cites Cotton v. Ship-By-Truck Co., 337 Mo. 270, 85 S.W.2d 80, 84[8], for the proposition that Missouri has always held a franchised carrier liable for a back-haul movement. We have decided that the Riggs and Transamerican leases were exempt from and not controlled by the 30-day-minimum-lease provision. There were no contractual arrangements between Riggs and Transamerican. Their business projects were independent and not joint or overlapping. Each of their leases provided that they should have exclusive control of the equipment and the driver. Any responsibility Riggs might have had for Murray's return trip was nullified when Murray departed on his own journey to Connecticut and then to South Bend, Indiana. All of the evidence tends to prove that Riggs and Transamerican were not engaged in a joint enterprise either under the federal law or the common law. Their right of control over Murray was several and successive, not joint. The right of Riggs to control the movements of Murray terminated at or before Transamerican's right began.

■ The rights and responsibilities of Transamerican ended in South Bend when the cargo was unloaded, the placards displaying the name and numbers of Transamerican as lessee were returned and Murray gave the authorized carrier his receipt for the repossession of the equipment. From then on Murray was on his own or under the right of control by Sykes as a jury may find. The trial court erred in refusing to direct a verdict in favor of Riggs and Transamerican.

The appellant Sykes contends that a submissible case was not made against it because there was no substantial evidence that Murray was acting in the scope of his employment or serving the business interests of Sykes at the time and place of the accident in question. On the other hand, the plaintiff contends that Murray was serving the business interest of Sykes because he was returning to his home base

or terminal, and that the responsibility of Sykes was established as a matter of law on the undisputed evidence. A finding by the jury that the Sykes lease had not been terminated would permit the further finding that Sykes was entitled to a contractual share of the revenue from the subleases made by Murray for the use of the leased equipment and his services; that the provisions of the Sykes lease were active and operative on the trip to Marshall until the Riggs lease was executed and operative; and that Sykes' right of control again became active and dominant for the return trip after the Transamerican lease was terminated and possession of the equipment was surrendered to Murray at South Bend. 60 C.J.S. Motor Vehicles § 436 c, p. 1091.

■ By virtue of the written agreement, Sykes acquired a leasehold interest in the Murray tractor during the existence of the lease. Sharp v. W. & W. Trucking Co., Mo., 421 S.W.2d 213, 218[2]. By paragraph 2 of the lease it was agreed that Sykes "will use said equipment in its motor carrier operations conducted under authority of various regulatory commissions of the states and the federal government and may use said equipment in connection with interchange or lease arrangements" made by Sykes with other carriers. Paragraph 11 provides that the lessee shall have exclusive use and possession of the equipment. Paragraph 2a provides that Sykes "shall have full and complete and exclusive direction and control over the driver of said equipment" including the right to hire and fire. Paragraph 5 states that lessor Murray "may be employed to drive this equipment covered by this lease as the employee of lessee and subject to full and complete control and direction by the lessee to the same extent as any other driver employed by lessee, * * *." Thus the lease agreement created a master and servant relationship between Sykes and Murray consistent with the Motor Carrier Act and commission regulations. The legal effect of the lease arrangement was that the carrier-lessee became liable for the negligence of the owner-driver of the leased equipment to the same extent it was responsible for the negligence of one of the lessee's own drivers when operating the carrier's own equipment. Wilcox v. Transamerican Freight Lines, Inc. (6 Cir.) 371 F.2d 403, 404[1]; Gackstetter v. Dart Transit Co., 269 Minn. 146, 130 N.W.2d 326, 328–329[2].

■ The mere existence of the relationship of master and servant, however, is not sufficient in and of itself to impose liability on the employer in all circumstances for whatever torts his employee may commit since all acts of an employee are not as an employee or necessarily in the course and scope of his employment. Hopkins v. J. I. Case Company, Mo., 293 S.W.2d 402, 405[1]. Sykes can be held liable for Murray's negligence only on an application of the principle of respondeat superior and the burden of proving that Murray was an employee and was acting in the scope of his employment at the time in question rests upon the plaintiff. Chandler v. New Moon Homes, Inc., Mo., 418 S.W.2d 130, 135[5,6]; Byrnes v. Poplar Bluff Printing Co., Mo., 74 S.W.2d 20, 22–23[3].

■ We dealt with a portion of the "going and coming" rule in Sharp v. W. & W. Trucking Company, Mo., 421 S.W.2d 213, and held in a somewhat similar situation that the employer was not liable for his employee's negligent conduct in driving his own truck from his home to the job site for a hauling assignment. The rule regarding the trip home from work is stated in 8 Am.Jur.2d, Automobiles and Highway Traffic, § 630, p. 185, as follows: "Since it is held that an employer ordinarily has no concern with the manner in which an employee gets to work, even though he drives his employer's motor vehicle, the employer is even less concerned with transporting the employee from his job to his home, so that in the absence of

evidence establishing a special interest of the employer in the trip, the worker is not in the scope of his employment in going from his work, even though he drives his employer's motor vehicle." The general rule is recognized and applied in this state. Gardner v. Simmons, Mo., 370 S.W.2d 359, 364[7]; Curtis v. Juengel, Mo.App., 297 S.W.2d 598, 601 and cases cited therein. See also annotations: 52 A.L.R.2d 311, § 9, and 52 A.L.R.2d 362, § 6. This rule has been applied to a motor vehicle leased by a certificated motor carrier to augment its equipment and which is operated by the owner-lessee. Wilcox v. Transamerican Freight Lines, Inc., 6 Cir., 371 F.2d 403, 404–405[1, 4], certiorari denied 387 U.S. 931, 87 S.Ct. 2053, 18 L.Ed.2d 992; Kaplan Trucking Co. v. Lavine, 6 Cir., 253 F.2d 254, 259[8]; Van Hook v. Strassberger, Mo.App., 259 S.W.2d 399, 407[13–14]; Stone v. Reed, Mo.App., 247 S.W.2d 325, 331–332[6–9]; Gackstetter v. Dart Transit Co., 269 Minn. 146, 130 N.W.2d 326, 329[4]; Schmidbauer v. Baltimore and Pittsburgh Motor Express Co., 228 Md. 637, 181 A.2d 325, 330[3].

The plaintiff's contention that Sykes was liable for Murray's tortious conduct as a matter of law cannot be sustained. Murray was making or had made a return trip from an interstate movement of motor freight. The point at which the return journey ended, or would end, depended on the location of the customary base of operations. The evidence on this issue was quite uncertain. It appears that the home office of Sykes was in Ironton about 20 miles south of Flat River. It had a "commissioned agent" in St. Louis, but whether it had a "terminal" there is disputed. Murray's home was in Flat River. In the Transamerican sublease, Murray stated the equipment was "based in the city of Flat River". On the other hand, the logs in evidence in Murray's own handwriting gives his "home terminal address" as St. Louis. The testimony of witnesses did little to clarify the location of the terminal point. There was no evidence of where the equipment was usually kept either before or after the July disagreement. It is not clear where Murray received orders or reported for hauling assignments. Plaintiff's instructions directing verdicts against the corporate defendants, especially No. 9 pertaining to Sykes, assumed the terminal point to be Flat River and made liability depend on whether the place where the accident happened was "on a logical route between Springfield, Massachusetts and Flat River." These and other fact questions cannot be resolved as a matter of law.

■ There was evidence from which the jury could reasonably find that Sykes did not effectively cancel its lease with Murray for the Mack tractor and that Murray remained a statutory employee of Sykes and at the time and place in question Murray was acting in the scope of his employment and advancing the business interest of his employer. Duke v. Thomas, Mo.App., 343 S.W.2d 656, 660[3, 4]; Sweat v. Brozman, 239 Mo.App. 1048, 198 S.W.2d 531, 535[3]; American Transit Lines v. Smith, 6 Cir., 246 F.2d 86, 88[3]; Kaplan Trucking Co. v. Lavine, 6 Cir., 253 F.2d 254, 257–258[4]. See also Mellon National Bank & Trust Co. v. Sophie Lines, Inc., 3 Cir., 289 F.2d 473 where material facts were stipulated or undisputed. The Kaplan case presents a factual situation similar to this case. Kaplan was a lessee of equipment owned by Mogielski and driven by Fotta, employed by the owner for that purpose. The Kaplan and Sykes leases were both controlled by the provisions of 49 CFR 207.4 regulating the means by which the equipment of authorized carriers may be augmented. There had been no effort to cancel the lease in the Kaplan case, however, and there was no evidence that Fotta was by custom or otherwise authorized to execute a trip lease somewhat comparable to Murray's arrangement with Transamerican for the trip from New Britain to South Bend. The common is-

sue is whether the driver of the equipment was acting for the lessee or was on a mission of his own at the time of the accident. In this respect the opinion states at page 257 of 253 F.2d: "The question still remains whether at the time of the collision Fotta was acting within the scope of his employment. It is the actual relationship of the parties at the time of the collision that is controlling. * * * In our opinion the question of whether Fotta was in the scope of his employment on Kaplan's business when the collision occurred was clearly one for the jury." The trial court did not err in refusing to direct a verdict in favor of Sykes.

■■■ All of the appellants joined with Sykes in the contention that the court committed reversible error in failing to give and read to the jury MAI 2.02 which is as follows: "The court does not mean to assume as true any fact referred to in these instructions but leaves it to you to determine what the facts are." This is a cautionary instruction intended to be given in all jury-tried cases immediately before the form of verdict instruction. The plaintiff's response to the appellants' contentions, as stated in his Points Relied On, is: "The Court should have given MAI 2.02 to the jury. However, none of the defendants can complain because none of them requested it. Moreover, none of them has shown prejudice from the failure of the Court to give it." Further in his written argument the plaintiff states: "The trial judge should have given MAI 2.02 on his own initiative whether requested to do so or not. It was technical 'error' for him to fail in that duty. This much we concede. But two further questions remain: (1) was the error prejudicial? and (2) did the appellants save the point for review?"

The plaintiff asserts that the defendants are not entitled to complain of the court's failure to give MAI 2.02 which no one requested because in civil cases no party may complain of the failure to give an instruction not requested; that this is especially true because MAI 2.02 is a cautionary instruction and it is not error to refuse a requested cautionary instruction even in a criminal case, citing State v. Costello, Mo., 415 S.W.2d 816, 817(1). The cases cited in support of these contentions are not controlling where mandatory provisions of Missouri Approved Instructions are to the contrary. S.Ct. Rules 70.01, 70.02 and 70.021, V.A.M.R. The notes on use under MAI 2.02 state: "This instruction is to be given in every case immediately before the form of verdict instruction." Further in Vernon's Missouri Approved Jury Instructions at page XXXIV is this admonition: "The notes on use following each instruction dictate the circumstances under which the instruction may be used. These must be followed." In concluding on page XXXV the directions state: "Neither the proposed instruction system nor any other system will succeed without the active supervision of the most important man in our judicial system, the trial judge." The court may give instructions on its own motion. S.Ct. Rule 70.01(a). Counsel need not object to instructions given at the request of a party or by the court on its own motion if specific objections are made in the motion for new trial. S.Ct. Rule 70.02.

In holding counsel was not estopped by his failure to call an omission to the attention of the court before the instructions were given this court in banc stated in Brown v. St. Louis Public Service Company, Mo., 421 S.W.2d 255, 260(6): "Finally, plaintiff claims that defendant should be estopped from complaining of the error in the instruction on the basis that defendant's counsel failed to call the omission to the attention of the court and counsel at the conference on instructions held pursuant to Rule 70.01(a). * * * We are of the opinion that this does not provide a basis for us to excuse the error in plaintiff's instruction or to apply es-

toppel against the defendant, and the contention is overruled."

■ Although MAI 2.02 is cautionary in nature, its use in every case is mandatory and a failure to give it cannot be excused on the ground that counsel did not call its omission to the attention of the court before the jury was instructed. Brown v. St. Louis Public Service Company, Mo., 421 S.W.2d 255, 257(2), 260(6); Murphy v. Land, Mo., 420 S.W.2d 505, 507(5); Hunter v. Norton, Mo., 412 S.W.2d 163, 166(10). It is clear that MAI 2.02 is deemed to be an integral part of a complete set of instructions under the system of approved jury instructions. The court's failure to include it was error.

■ Further, the plaintiff asserts that the defendants have not demonstrated that the error was prejudicial. This case was complex and highly unusual in several respects including the extent and nature of the fact issues on which the jury had to be instructed. Sixteen instructions in all were given. Four of them directing verdicts were given at the request of the plaintiff. The number and nature of the factual issues involved illustrate the need of a cautionary instruction such as MAI 2.02. The defendant Sykes undertook to demonstrate the need for an instruction warning the jury that the court did not mean to assume as true any fact referred to in the instructions. The other defendants adopted this presentation and Murray added some of his own. In view of recent decisions, however, there is no need to indulge in a further discussion of the merits of these specifications. In Brown v. St. Louis Public Service Company, Mo., 421 S.W.2d 255, 259(3) where there was an omission from a MAI given instruction this court in banc held: "Accordingly, where there is deviation from an applicable MAI instruction which does not need modification under the facts in the particular case, prejudicial error will be presumed unless it is made perfectly clear by the proponent of the instruction that no prejudice could have resulted from such deviation." To the same effect are the holdings in Murphy v. Land, Mo., 420 S.W.2d 505, 507(3-7) and Gousetis v. Bange, Mo., 425 S.W.2d 91, decided March 11, 1968. This same rule must be applied where there is a total omission of a mandatory MAI instruction. It has not been made perfectly clear that no prejudice could have resulted from the failure to give MAI 2.02 and on the record before us we must hold that the error was prejudicial. The judgment must be reversed and the cause remanded for that reason.

The defendants Sykes and Murray further assigned error in the giving of other instructions and regarding the amount of the recovery. Some of the remaining questions are substantial and appear to have merit. However, the error we have held to be prejudicial affects the entire submission and the remaining issues need not be treated further. The issues will be narrowed on a retrial and the submission should be made in accordance with the questions we have held to be material and decisive. What we have said should furnish sufficient guidelines for a proper submission.

Accordingly the judgments against Transamerican and Riggs are reversed. The judgments against Sykes and Murray are reversed and as to them the cause is remanded.

HENLEY, P. J., and CRAIG, Special Judge, concur.

SEILER, J., not sitting.